974 So.2d 635 (2008)
John and Klea HEBERT
v.
RAPIDES PARISH POLICE JURY, et al.
Nos. 2006-C-2001, 2006-C-2164.
Supreme Court of Louisiana.
April 11, 2007.
Opinion on Rehearing January 16, 2008.
Rehearing Denied March 7, 2008.
*638 Provosty, Sadler, DeLaunay, Fioroenza & Sobel, John Dexter Ryland, Ronald J. Fiorenza, Alexandria, for Applicant in No. 2006-C-2001.
Broussard, Bolton, Halcomb & Vizzier, Roy Seale Halcomb, Jr., Alexandria, Bussey & Lauve, Robert Lewis Bussey, Alexandria, James C. Downs, District Attorney, for respondent in No. 2006-C-2001.
Broussard, Halcomb & Vizzier, Roy Seale Halcomb, Jr., Alexandria, James C. Downs, District Attorney, Robert Lewis Bussey, Assistant District Attorney, for respondent in No. 2006-C-2001 on rehearing.
Broussard, Bolton, Halcomb & Vizzier, Roy Seale Halcomb, Jr., Alexandria, for applicant in No. 2006-C-2164.
Broussard, Halcomb & Vizzier, Roy Seale Halcomb, Jr., Alexandria, for applicant in No. 2006-C-2164 on rehearing.
Provosty, Sadler, Delaunay, Fiorenza & Sobel, John Dexter Ryland, Ronald J. *639 Fiorenza, Alexandria, Bussey & Lauve, Robert Lewis Bussey, Alexandria, James C. Downs, District Attorney, for respondent in No. 2006-C-2164.
Provosty, Sadler, Delaunay, Fiorenza & Sobel, John Dexter Ryland, Ronald J. Fiorenza, Alexandria, James C. Downs, District Attorney, Robert Lewis Bussey, Assistant District Attorney, for respondent in No. 2006-C-2164 on rehearing.
KNOLL, Justice.
This fatal automobile accident case presents the legal questions of whether the Louisiana State Department of Transportation & Development ("DOTD") assumed a duty for an "off-system" bridge and whether La.Rev.Stat. 48:35 required DOTD to withhold funds allocated to the Rapides Parish Police Jury ("RPPJ") until RPPJ brought the bridge into compliance with DOTD standards. Plaintiffs, John and Klea Hebert ("the Heberts"), brought a wrongful death and survival action against the State through DOTD and RPPJ for their young daughter's death as a result of a one-automobile accident that occurred on a RPPJ "off-system" road and bridge. Due to RPPJ's request for a bench trial, the trial was bifurcated and DOTD's alleged fault was tried to a jury. The jury found DOTD and RPPJ were both fifty percent at fault. In determining RPPJ's liability, the district judge assessed no fault to DOTD, attributed sixty percent fault to the deceased driver, and assessed the remaining forty percent fault to RPPJ. Both DOTD and the plaintiffs appealed. The court of appeal amended the judgment of the district court, assessing ten percent fault to the deceased driver, forty percent fault to RPPJ, and fifty percent fault to DOTD, and affirmed the judgment as amended. We granted writs primarily to address the issue of DOTD's alleged duty for the "off-system" bridge. Hebert v. Rapides Parish Police Jury, 06-2001, 06-2164 (La.11/9/06), 941 So.2d 29. For the following reasons, we find plaintiffs failed to prove by a preponderance of the evidence that DOTD assumed a duty for the "off-system" bridge or that La.Rev. Stat. 48:35 mandated DOTD should have withheld funds from RPPJ, and reverse the judgment of the court of appeal.

FACTS AND PROCEDURAL HISTORY
This case arises out of a tragic automobile accident that occurred on October 15, 1995, at approximately 9:00 p.m., on Haines Creek Bridge located on Philadelphia Road in Ward 11 of Rapides Parish, Louisiana. Katie Hebert ("Katie"), the Heberts' 17-year-old daughter, was driving her parents' 1992 four-door Pontiac Grand Am automobile eastbound on Philadelphia Road, an "off-system" road in rural Rapides Parish. As she entered an "on-grade" left-hand curve, the passenger side tires of her vehicle drifted onto the right side, unimproved, gravel shoulder and struck a deep drop-off of six to eight inches, which had formed at the roadway edge. Marks in the dirt and gravel on the shoulder indicated the right tires of the vehicle continued on the shoulder for approximately ninety-nine feet, then the vehicle traveled left and diagonally across the roadway. After traveling approximately fifty-six feet more, the vehicle "oversteered" to the right causing the vehicle to "yaw" out of control. After traveling another sixty feet, the driver's side door struck the end of the pipe bridge rail constructed of heavy gauge "drill-stem" three-inch pipe, which bordered the concrete bridge crossing Haines Creek. Guardrails were not attached to the ends of the pipe bridge rails. Both front and back rims on the left wheels had flattened, heavily scratched spots, which appeared to indicate that the vehicle was "up on two *640 wheels" just prior to impact with the end of the bridge rail.
After the impact, the vehicle rolled, coming to rest on the rail overturned with the front of the vehicle projecting from the bridge outward and suspended precariously above the creek. As a result of metal crush, Katie sustained severe mortal injuries and was tightly "pinned" within the vehicle.[1] Upon arrival of the volunteer fire department and ambulance personnel, the vehicle and damaged bridge were stabilized, life support initiated on Katie, and extrication procedures commenced. The total time from the collision to the air-med lift-off was approximately two hours. Although Katie was successfully resuscitated upon arrival at the hospital, she succumbed to her injuries and was pronounced dead at 2:42 a.m.
While investigating the accident, State Trooper Daniel B. Westmoreland noted that the eastbound approach to the curve and bridge where the accident occurred had no signs to indicate a speed limit or an impending curve, and lacked a roadway edge (fog-line). Additionally, the yellow-dashed line in the center of the roadway was badly faded in daytime and virtually invisible at night.
Philadelphia Road and the Haines Creek Bridge are part of an "off-system" roadway, owned and maintained by RPPJ.[2] The bridge was constructed by RPPJ in December of 1980 to replace the previous bridge crossing Haines Creek that was built in 1955 and closed to travel sometime earlier in 1980. In January of 1981, DOTD began to perform bridge inspections on the new construction every two years pursuant to federal regulations. In each of its inspection reports, DOTD made remarks regarding the substandard conditions of the bridge, particularly the lack of guardrails. This deficiency first appeared in the 1983 bridge inspection report issued by DOTD, having not been previously noted in the 1981 bridge inspection report. Prior to Katie's accident, neither DOTD nor RPPJ took any action to remediate those conditions.
The Heberts sued RPPJ, DOTD, and the contractor who built the bridge, Slocum Construction and/or Slocum Manufacturing ("Slocum") and its liability insurers for damages. Because the suit was filed against the contractor more than five years after the applicable peremptive period had commenced, Slocum and its insurers were dismissed from the suit pursuant to La.Rev.Stat. 9:2772. The suit proceeded against the remaining defendants. The plaintiffs asserted that the absence of guardrails at the end of the bridge rails was the primary cause of Katie's death and that both defendants were responsible for this condition.[3] RPPJ and DOTD countered that Katie's excessive speed upon entering the curve was the cause of the accident and resulting injuries.
The district judge, completing the same verdict form completed by the jury, found RPPJ forty percent at fault and Katie sixty percent at fault. He did not assess any liability to DOTD. The jury, on the other hand, found RPPJ and DOTD to be equally at fault and assessed each with fifty percent liability for the accident. It assessed no fault to Katie. The jury's *641 verdict form reflected an award for general damages to the Heberts in the amount of $750,000 each, a joint award of survival damages for Katie's pre-death pain and suffering in the amount of $25,000, and special damages to the plaintiffs in the amount of $43,871.24, for a total damage award of $1,568,871.24. The district judge's verdict form reflected an award of $500,000 to Mrs. Hebert in general damages, $700,000 in general damages to Mr. Hebert, total survival damages in the amount of $100,000, and special damages totaling, $80,066.
The district court rendered a single judgment.[4] In accordance with the separate verdicts rendered by the court and the jury, DOTD was to pay the Heberts $375,000 each in general damages and $24,435.63 jointly, with legal interest on all amounts awarded from the date of judicial demand until paid. RPPJ was ordered to pay Mrs. Hebert $200,000, to pay Mr. Hebert $280,000, and to pay them jointly special damages in the amount of $53,591.50, with legal interest on all amounts awarded from the date of judicial demand until paid. All court costs were assessed equally to DOTD and RPPJ.
DOTD filed a motion for judgment notwithstanding the verdict and alternative motion for new trial, alleging there was insufficient evidence establishing DOTD paid for or participated in the construction of the bridge and no evidence that DOTD maintained the bridge, which the district court denied. DOTD suspensively appealed the judgment to which the Heberts answered,[5] and the matter was heard by a five-judge panel of the Third Circuit Court of Appeal that amended the district court's judgment and affirmed the judgment as amended, with one dissenting judge who would have found no liability against DOTD. Hebert v. Rapides Parish Police Jury, 05-471 (La.App. 3 Cir. 7/12/06), 934 So.2d 912.
Without first determining whether DOTD owed a duty, the appellate court analyzed the reconciling of the inconsistent verdicts. After analyzing the various approaches to reconciling conflicting verdicts, the court of appeal adopted the approach of the Fourth Circuit and undertook a de novo review of the record to make its own independent findings[6] Based on its de novo review, the appellate court determined that DOTD, as well as RPPJ, were both legally responsible for the maintenance of the bridge and concluded that the lack of the guardrails on the Haines Creek Bridge created a hazardous and dangerous condition. As to DOTD specifically, the court found:
Without addressing whether La. R.S. 48:35 imposes a legal duty on the DOTD in this case, we find that the DOTD assumed a duty to maintain this bridge because it carried out biennial inspections of this non-conforming bridge over a fifteen-year period, participated in the construction of the bridge in 1980, and had constructive and, eventually, actual knowledge that it was built in a nonconforming manner. See Archon v. Union Pac. R.R., et al., 94-2728, 97-2743 (La.7/2/96), 675 So.2d 1055 (finding that the DOTD assumed a duty of upgrading *642 a railroad crossing with active signals when it ordered a site survey and breached that duty when it failed to upgrade the crossing after the survey).
Hebert, 05-471 at pp. 12-13, 934 So.2d at 922.
Although the panel concluded that Katie's negligence likely set the course for the accident to happen, it found the extent of the resulting harm to her was a direct result of her vehicle's impact with the exposed and unguarded pipes of the bridge railing. Accordingly, the court found RPPJ's and DOTD's fault was more substantial and, therefore, allocated ten percent of the fault to Katie, fifty percent to DOTD, and forty percent to RPPJ. General damages in the amount or $750,000 each were awarded to Mr. and Mrs. Hebert for the wrongful death of Katie; $100,000 was awarded to the Heberts jointly for the piedeath pain and suffering of Katie; and various special damages were awarded as well.

LAW AND ANALYSIS
The seminal issue in this case is whether DOTD assumed a duty for the "off-system" bridge at issue and more specifically, whether plaintiffs proved the existence of an assumption of duty by a reasonable preponderance of the evidence., Also of issue is whether La.Rev.Stat. 48:35 required DOTD to withhold all funding allocated to RPPJ until the bridge was brought into compliance with DOTD standards.[7]
Negligence of DOTD
Most cases alleging negligence on the part of a public body have been analyzed by this Court under' the duty-risk analysis. Cormier v. T.H.E. Ins, Co., 98-2208, p. 6 (La.9/8/99), 745 So.2d 1, 7. In the classic duty-risk analysis, one of the inquiries the court must answer is: What, if any, duties were owed by the respective parties? Cormier, 98-2208 at pp. 6-7, 745 So.2d at 7; Mart v. Hill, 505 So.2d 1120, 1122 (La.1987). The particular facts and circumstances of each individual ease determine the extent of the duty and the resulting degree of care necessary to fulfill that duty. Cormier, 98-2208 at p. 7, 745 So.2d at 7. A plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Id.; Berry v. State Through Dept. of Health and Human Resources, 93-2748, p. 4 (La.5/23/94), 637 So.2d 412, 414,
The plaintiff bears the burden of proof and must establish his claim by a preponderance of the evidence. Benjamin ex rel. Benjamin v. Housing Authority of New Orleans, 04-1058, p. 5 (La.12/1/04), 893 So.2d 1, 4-5. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La. 989). It follows from this, that speculation, conjecture, mere possibility, and even unsupported probabilities are not sufficient to prove a plaintiffs claim. See Coon v. Placid Oil Co., 493 So.2d 1236, 1240 (La. App. 3d Cir.), writ denied, 497 So.2d 1002 (La.1986).
Whether a particular duty should be imposed on a particular governmental agency is a policy question to be determined by the court. Cormier, 98-2208 at *643 p. 7, 745 So.2d at 8. The inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his claim. Berry, 93-2748 at p. 4, 637 So.2d at 414. It is a court's role to determine whether there is any jurisprudential or statutory rule, or policy reason why, under the facts and circumstances of the case, the state would owe a duty to compensate the plaintiff for his personal injuries. Cormier, 98-2208 at pp. 7-8, 745 So.2d at 8; Berry, 93-2748 at p. 5, 637 So.2d at 414. Consequently, whether a duty is owed is a question of law for the court to decide based upon the facts and circumstances of the case as established in the evidence of record. Lemann v. Essen Lane Daiquiries, Inc., 05-1095, p. 7 (La.3/10/06), 923 So.2d 627, 633.
In the present case, the Heberts presented two theories for recovery against DOTD: (1) the bridge was constructed using state or DOTD funds, and DOTD participated in the construction and maintenance of the bridge, thereby it assumed a duty that the bridge should have met DOTD's minimum safety standards; and (2) DOTD knew that the bridge was constructed without guardrails, in violation of its own minimum safety standards, and therefore, as provided by La.Rev.Stat. 48:35, DOTD was required to withhold from RPPJ any funds allocated to RPPJ for construction purposes until guardrails were added to the ends of the bridge. The plaintiffs had the burden of proving these theories by preponderance of the evidence. We will now discuss each theory in turn.
Assumption of Duty
At issue in this case is the substandard condition of an "off-system" bridge. While the State has a duty to maintain and render safe all bridges and roads included in the state highway system, i.e., "on-system" bridges, where the bridge is not on the state highway, i.e., an "off-system" bridge, and falls within a parish, but outside the corporate limits of any municipality, the duty to maintain the bridge and render it safe rests with the parish. Breshers v. Dept. of Transp. and Development, 536 So.2d 733, 736 (La.App. 3d Cir.1988), writ denied, 541 So.2d 854 (La.1989). In this case, the duty to maintain and render safe the bridge in question in accordance with the state safety standards rests with RPPJ as the bridge is located in Rapides Parish on a RPPJ road. Because the duty by law fell upon RPPJ, DOTD could be found liable for the breach of this duty only if the evidence demonstrates DOTD assumed the duty of RPPJ for the bridge.
Under Louisiana law, one who does not owe a duty to act may assume such a duty by acting. Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law 5.07[6], 5-27 (Supp.2006). In Bujol v. Entergy Services, Inc., 03-0492, p. 16 (La.5/25/04), 922 So.2d 1113, 1129, this Court explained this concept of assumption of duty and stated an assumption of duty arises when the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person. Bujol involved the alleged assumption of the duty of a subsidiary to provide a safe working environment by a parent corporation under the "Good Samaritan Doctrine" as codified in Section 324A of the Restatement (Second) of Torts. 03-0492 at pp. 14-15, 922 So.2d at 1128. We find the relationship between a parent corporation and its subsidiaries analogous to the relationship between DOTD and the highway departments of political subdivisions of the State, such as RPPJ. Therefore, we find the assumption of duty doctrine announced in Bujol applicable in this case.
*644 The Bujol court described the action required by the defendant in such instances as an affirmative undertaking and further explained that the determination of whether such an action was taken involves an examination of the scope of the defendant's involvement, the extent of the defendant's authority, and the underlying intent of the defendant. 03-0492 at p. 18, 922 So.2d at 1131. As in other civil cases, the burden is on the plaintiff to prove by a preponderance of the evidence facts sufficient to establish the action undertaken by the defendant. See e.g., Bujol, 03-0492 at p. 16, 922 So.2d at 1130.
However, neither a defendant's concern with safety conditions and its general communications regarding safety matters, nor its superior knowledge and expertise regarding safety issues, will create a duty to guarantee safety. Bujol, 03-0492 at p. 21, 922 So.2d at 1133. Likewise, inspections and mere safety recommendations, which recommendations are not mandatory and are not within the authority of the defendant to remediate, cannot create such a duty. Id. at 20-22, 1133-34.
The Heberts seek to establish DOTD assumed RPPJ's duty for the Haines Creek Bridge by proving DOTD funded the bridge replacement project, DOTD participated in the construction of the bridge, or DOTD maintained the bridge. Under the facts and circumstances as established in the evidence of record, we find the plaintiffs did not prove facts, i.e., actions of DOTD, sufficient to establish DOTD affirmatively undertook or assumed the duty of RPPJ for the bridge. The reasons we so find are threefold.
First, there is no evidence of record that DOTD funded the reconstruction of the Haines Creek Bridge. What the evidence does clearly establish is that the funds used came from the State. Cecil Raggio, a retired RPPJ Parish Engineer and the only fact witness with first-hand knowledge of the reconstruction process, so testified, but clarified that, by saying the funds came from the State, he did not intend to mean DOTD, explaining:
I don't know if it came through an agency of the State. I don't know if it was, per se, DOTD. I know that our bridges that we maintain, we communicate with DOTD at all times when work is being done on them. I believe that the funds were obtained possibly obtained through [the] Governor's Office, I'm not sure.
According to trial testimony, such funds would have likely come through a special fund of the Governor's Office for special projects over which DOTD had no control.
Mr. Raggio also testified regarding his December 11, 1980 letter addressed to Mr. Billy C. Daniels, District Maintenance Engineer for DOTD, in which he notified DOTD of the new construction:
Please be advised that the Rapides Parish Police Jury has replaced the above referenced bridge which is located on the Philadelphia Road in Ward 11. This bridge crosses Haines Creek, and was completed on December 9, 1980.
The new bridge is four-twenty foot spans constructed of treated timber piles and headwalls, precast concrete caps and decking. The width of the new bridge is 24'-9" from out to out with 3" pipe hand railing.
The letter contained a project number, "XXX-XX-XX." Much testimony was elicited regarding this number in the plaintiffs' attempt to prove this number was a DOTD number. Plaintiffs sought to prove this because of the testimony of Rhett Desselle, DOTD's representative at trial, who testified that if DOTD monies had been used to finance the bridge construction, the project would have received a DOTD number. Mr. Raggio testified that the *645 number was a "State project number," but he did not know "whether it's a DOTD number." The only origin that the number had was that RPPJ had to refer to that number when writing to the State for reimbursement and that could have well been to the Governor's Office. On cross-examination by plaintiffs' counsel, Mr. Raggio agreed that it would be fair for one to be led to believe that the number was probably a DOTD number, because the number appeared in a communication between RPPJ and DOTD. Yet, as noted above, that communication contained no request for payment, but was merely a notification of completion and a description of the construction.
Mr. Desselle, on the other hand, explained the reason why RPPJ sent the letter to DOTD:
They're required to. We maintain the inventory of all the bridges in the state whether they are our bridges or off-system bridges, owned by other people. Each time they have a change to that bridge whether they close it, they change the load posting on it, they put in a new bridge, they close it, take it out of service, they are required to inform us of what changes they are making to that bridge, so we can update the inventory. And that information is passed on, not only to our headquarters in Baton Rouge, but also to the Federal Highway Administration.
As to the funding of the project, Mr. Desselle testified that after researching DOTD's records he could find no record that the federal government, DOTD, or the State funded this reconstruction, although he conceded that the State could have funded this project:
To my knowledge and my research of the records of DOTD, no funds to repair this bridge came through DOTD. I am aware of another avenue. The Governor, the Governor's office has some discretionary funds for emergency replacement of bridges or repair of bridges that I am familiar with. Those funds do not come through DOTD and we really don't have anything to do with it. Usually the bridge owner makes application to the Governor's office. Part of that application is, there is a little checklist that I have to fill out as the Maintenance Engineer to say that there is a bridge there. This entity is the owner. And answer a few little questions and they make, they make this application to the Governor's office. What happens from there, it's outside of DOTD's realm and outside of what goes on that I am aware of what goes on.
Regarding the project number "XXX-XX-XX," Mr. Desselle testified he researched the project number in DOTD's project history data base that dated back to the 1930s and could not find any information on that project number. The number simply did not exist in DOTD's records. He further explained DOTD's project numbering system with regards to off-system bridges:
A. Okay. On the project number we have a numbering scheme. The first, it starts out there's three digits, a dash, two digits and a dash, and another two digits. The first three digits for our off-system bridge replacement program is always going to be 713. That signifies that the money is coming out of off-system, federal off-system bridge replacement funds.
Q. You said "713?"
A. 713
Q. Okay. Can you read the first three numbers of the project number for me?
A. 737.
Q. Not 713.

*646 A. That's correct.
Q. Okay. And,
A. The second two digits normally signify the parish that the bridge is in. What we do is we take all the parishes and put them in alphabetical order and we number them. Rapides Parish is parish number forty (40) in that numerical order.
Q. And what number is Rapides Parish, is designated for Rapides Parish?
A. Forty (40).
Q. And, can you read for the jury what number is there?
A. 05.
Q. And the last section of the number. Can you tell me?
A. It's 39.
Q. And what does that refer to?
A. In our numbering scheme, it's just a unique number for that individual bridge replacement project. That's the only thing unique to that bridge or to that project.
On cross-examination, Mr. Desselle did concede the project number at issue had the same format as older DOTD project numbers.
Although the State may have funded this project, most probably through the Governor's Office, the evidence does not preponderate that DOTD monies were used in the funding of the bridge reconstruction. Mr. Raggio's concession regarding the probability that the number contained in his letter to DOTD was a DOTD project number is not supported by any evidence of record. Therefore, we find the plaintiffs failed to prove by a preponderance of the evidence DOTD funded the project and likewise that by funding the project, DOTD assumed the duty of the owner, RPPJ, to construct the bridge in accordance with its safety standards.
Second, while plaintiffs make allegations that DOTD supervised the construction of the bridge, the record does not support their allegations. The evidence at best is too speculative on this issue. Plaintiffs called Mr. Raggio, a former RPPJ engineer, under cross-examination, who was the only fact witness employed by either RPPJ or DOTD at the time of the bridge construction. He testified RPPJ took "opened and sealed" bids for the construction of a bridge to replace the bridge crossing Haines Creek, built in 1955 and closed in 1980. Because Slocum was the low bidder, RPPJ awarded the bid to Slocum's construction company. Slocum did not provide RPPJ with any plans for building the bridge, just the cost of the proposed construction. RPPJ paid Slocum after the bridge was built in December of 1980, once Mr. Raggio wrote a letter to the treasurer of RPPJ recommending payment, which he did either during the construction or at the completion of the bridge. Mr. Raggio could not recall if DOTD participated in the construction of the bridge in 1980. Moreover, although progress reports were kept by Mr. Raggio throughout the construction process for payment from RPPJ, no such reports were submitted to the court, nor were any documents requesting payment from either RPPJ or the State.
Significantly, we note Slocum did not testify at trial, and if DOTD supervised the construction of the bridge as plaintiffs claim, Mr. Slocum could have verified this fact. Arguably, DOTD did not call Slocum, but the burden rests with plaintiffs to prove their allegations by a preponderance of the evidence, not DOTD.
Jerry Burnaman, a DOTD bridge inspector, also testified. He stated he had worked for DOTD for about twenty-two years at the time of trial, which would indicate his employment began in 1982 and *647 that he was not employed with DOTD at the time of the reconstruction of the Haines Creek Bridge. Based upon his knowledge and experience, he testified that if a parish bridge is constructed using State funds, DOTD has one of its inspectors present at the job location during the construction phase of the project to see that the bridge is built under the standards of the plans. He did not know, however, if there was a state inspector present when the bridge in question was built:
A. At this particular bridge, I couldn't say this it was a bridge, you know, bridge inspector at it to inspect it as it was built. This is, this was before we started our bridge program when this bridge was constructed.
Q. So, if State funds were being used or DOTD funds were being used would there have been a state inspector there?
A. That's correct.
We find this ambiguous testimony does not establish DOTD inspected the Haines Creek bridge during construction. Consequently, we find plaintiffs' scant evidence on this issue fails to preponderate that DOTD participated in the construction or even inspected the construction of this bridge.
Third, as to plaintiffs' allegation that DOTD participated in the maintenance of the bridge because of its inspections after completion of construction, we find inadequate proof in the record. Merely performing inspections required by federal law does not constitute maintenance so as to find an assumption of duty by DOTD, especially when DOTD has no authority under law to actually maintain the "off-system" bridge at issue. See e.g., Bujol, 03-492 at pp. 20-21, 922 So.2d at 1133-34. No party in this case disputes DOTD inspected the Haines Creek Bridge after its reconstruction or that DOTD hand-delivered its inspection reports to the RPPJ almost immediately after each inspection. What the evidence does not demonstrate is that the inspection constituted maintenance of the bridge.
Although all the inspection reports maintained in the files of RPPJ regarding the Haines Creek Bridge were introduced through the testimony of Mr. Raggio, Mr. Desselle explained the purpose of the inspections:
The main purpose of the bridge inspection reports is to comply with the National Bridge Inspection Standards. And in order for us to do that, we have to do the inspections every two years, prepare a report, and turn it over to the bridge owner.
* * *
In 19__, I think, @79, and the legislation, the federal legislation, I think, started in @78, National Bridge Inspection Standards came into being and the federal government required each state transportation agency to develop a program to inventory all of the bridges that are in public use, to inspect them every two (2) years, to determine how much load that they can carry safely.
Admittedly, even though the bridge inspection reports would make the bridge owner aware of the bridge's deficiencies as to DOTD safety standards under the section of the reports entitled "Remarks," Mr. Desselle stated the reports were made in accordance with federal regulations under the National Bridge Inspection Standards and the remarks were merely recommendations, but were not mandatory.
Although adopted in 1971 by the Federal Highway Administration to implement section 26 of the Federal-Aid Highway Act of 1968, 23 U.S.C. 116(d), the National *648 Bridge Inspection Standards[8] were not made applicable to "all structures defined as bridges[9] located on all public roads" until 1979. See 44 Fed.Reg. 25435; 23 CFR 650.301, 260 (1980).[10] Through the 1979 amendment, "off-system" bridges were included in those bridges subject to the standards, and each state highway department was required to "include a bridge inspection organization" capable of performing inspections, preparing reports, and determinating ratings in accordance with the provisions of the American Association of State Highway and Transportation Officials's ("AASHTO") Manual for Maintenance Inspection of Bridges 1978 ("the Manual")[11] and the standards contained therein. See 23 CFR 650.303, 260 (1980); 44 Fed.Reg. 25435.
Each bridge was to be inspected at regular intervals not to exceed 2 years in accordance with Section 23 of the Manual, but the depth and frequency to which the bridges were to be inspected depended on such factors as age, traffic characteristics, state of maintenance, and known deficiencies. See 23 CFR 650.305, 261 (1980). A bridge inspection was described as the use of techniques required to determine the physical condition of the structure. Manual, Sec. 2.1 at 3. These inspections were required to include several observations,[12] the findings and results of which had to be recorded on standard forms. See 23 CFR 650.309, 261 (1980). The data required to complete the forms and the functions which had to be performed to compile the data were contained in section 3 of the Manual,[13] which, as pertinent to this case, *649 stated that the records "should provide a full history of the structure including all recommendations for strengthening and repair along with the actions which have been taken on these recommendations." See id; Manual, Sec. 3.1 at 18. Additionally, "all recommendations and direction for corresponding repair and maintenance" of the bridge and its site, all signs of distress, failure, or defects worthy of mention, and descriptions of condition and appraisal had to be noted with sufficient accuracy so that another inspector at a future date could easily make a comparison of the condition or rate of disintegration. Manual, Sec. 2.4.3 at 16.
Moreover, through the 1979 amendment, each state was required to prepare and maintain an inventory of all bridge structures subject to the Standards, i.e., all bridges located on public roads. See 23 CFR 650.311(a), 261(1980); 44 Fed.Reg. 25435. Under these Standards, certain structure inventory and appraisal data had to be collected and retained within the various departments of the state organization for collection by the Federal Highway Administration as needed. See id. All bridges had to be inventoried by December 31, 1980, see 23 CFR 650.311(b), 261 (1980), and the inventory reports, in accordance with the Standards, had to contain the general description, history, and plans of the bridge, and incorporate the inspection reports and stress analysis, which reflected conditions and recommendations regarding the bridge and its site. Manual, Sec. 3.2.1 at 18.
As demonstrated in the reports on file with the RPPJ regarding the Haines Creek Bridge, DOTD first inspected the structure on February 26, 1980. This inspection report included a structure inventory and appraisal sheet identical to that contained in the Manual. See Manual, Plate 10 at 55. The inspection report contained the information required by the Manual.[14] The bridge was next inspected on June 25, 1980, and in the report, it was noted that the bridge had been removed from service and that the site would "be checked one year from date for new bridge or pipes." The next inspection occurred five months earlier than scheduled on January 23, 1981, which report noted "[t]his is a new bridge that replaces previous bridge." From that date until the July before the accident at issue, the bridge was inspected every two years.
The reports were issued on standard forms, which contained a "Remarks" section, and a copy of each report was given to the owner of the bridge, in this case RPPJ. Notably, the information collected in each report on file with the RPPJ coincided with the information required by the Manual, including the recommendations regarding deficiencies contained in the "Remarks."
This evidence in conjunction with the testimony in this case clearly establishes the inspections were conducted in accordance with federal law, and DOTD only inspected the bridges and made remarks regarding noted deficiencies because it was required by the federal standards to do so. The federal standards did not require *650 DOTD or any state agency to correct the deficiencies, but rather merely mandated that the various transportation departments maintain records of the deficiencies in their inspection and inventory reports for the benefit of future inspections, while providing no procedure to remedy the noted deficiencies.
Moreover, merely delivering a copy of these reports with remarks regarding the deficiencies of the bridge does not constitute maintenance nor does it create a duty to guarantee safety. See Bujol, 03-0492 at pp. 20-21, 922 So.2d at 1133-34. The remarks, while directed to the bridge owner, were mandated by the standards for record-keeping purposes and future inspections. Further, given the fact that the deficiencies noted in the remarks sections, i.e., the need for guardrails, were not remediated prior to the accident, the record cannot establish these reports were used in the actual maintenance of the bridge, even though plaintiffs categorize these reports as free inspections to aid RPPJ in its maintenance of the bridge. As emphasized by plaintiffs' counsel, DOTD obviously did have knowledge of RPPJ's failure to remediate the deficiencies, yet such information was required to be recorded by the federal standards, but not to be remedied.
Additionally, DOTD had no authority under Louisiana law to maintain the "off-system" Haines Creek Bridge. The Legislature by enacting La.Rev.Stat. 48:757 prohibits such action by DOTD under the facts of this case.[15] In light of this prohibition and the evidence of record that demonstrates DOTD inspections were done in accordance with the federal mandate of the. National Bridge Inspection Standards, we find DOTD did not assume the duty of RPPJ to maintain the bridge in question or that plaintiffs sufficiently es: tablished such an undertaking by DOTD. Furthermore it seems illogical economically and administratively to assume such a duty is imposed to maintain "off-system" bridges based on the mandated inspections when the federal law that obligates DOTD *651 to inspect does not require maintenance, but merely a record-keeping function, and state law prohibits such maintenance.
Finding plaintiffs' assumption of duty theory meritless, we turn now to a discussion of plaintiffs' theory of liability arising from La.Rev.Stat. 48:35.
Statutory LiabilityLa. Rev. Stat. 48:35
When the Haines Creek Bridge was built in 1980, La.Rev.Stat. 48:35 provided:
The office of highways of the Department of Transportation and Development shall adopt minimum safety standards with respect to highway design, construction and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials. Hereafter, the state highway system and all public roads, highways and streets under the jurisdiction of any political subdivision of this state shall conform to such safety standards.
* * *

lf any such improvements constructed by a political subdivision of this state fail to conform to such standards, payment of any funds allocated to said political subdivision for such construction purposes shall be withheld by the Department of Transportation and Development until such time as the standards established by the department are complied with. (Emphasis added).[16]
Plaintiffs assert under this statute DOTD was required to withhold all funding to RPPJ until RPPJ brought the bridge in question up to DOTD standards. A plain reading of the statute, however, does not support such an interpretation.
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature. La. Civ.Code art. 9; Pumphrey v. City of New Orleans, 05-979, p. 10 (La.4/4/06), 925 So.2d 1202, 1209. Moreover, the words of a law must be given their generally prevailing meaning. La. Civ.Code art. 11; Pumphrey, 05-979 at p 11, 925 So.2d at 1209-10.
As written, La.Rev.Stat. 48:35 does require DOTD to withhold payment of any funds allocated to a political subdivision for "such construction purposes" if any "such improvements" constructed by the political subdivision fail to conform to DOTD standards. The key term in this statute is the adjective "such," which is defined as "of this or that kind; having a quality just specified or to be specified." Merriam Webster Desk Dictionary, "such adj," 542 (1995). The use of the adjective "such" is a limitation on the objects described to those of a specific kind or quality previously *652 specified or to be specified, giving the objects some particularity.
With this understanding, "such improvements" clearly refer to particular roads, highways, and streets as specified in the previous paragraph constructed by the political subdivision with funds allocated by DOTD. "Such standards" logically refer to the standards specified in the preceding paragraph to be adopted by DOTD in conformity with AASHTO standards, and "such construction purposes" unambiguously refer to the specific improvements constructed by the political subdivisions mentioned previously in the statutory sentence. Thus, the language of the statute clearly provides for withholding funds allocated for construction purposes during a particular or specific non-conforming construction project for which DOTD funds were allocated. The statute does not provide for the blanket withholding of funds allocated to RPPJ for all construction projects or purposes. Moreover, testimony at trial demonstrated DOTD has always interpreted the statute as requiring the withholding of funds allocated to "that individual [DOTD funded] construction project," not on all construction projects in general.
Clearly, the statute applies to funding of a particular construction project not in conformity with the standards and requires the funds allocated from DOTD be withheld until the particular project conforms with DOTD standards. The only funding at issue in this case subject to La.Rev.Stat. 48:35, therefore, is the funding for the 1980 bridge reconstruction project. Because the plaintiffs failed to establish DOTD funded the bridge reconstruction project at issue and cannot, therefore, prove DOTD could have with-held funds without proof such funds were allocated by DOTD, the statute is not applicable under the facts of this case.[17] Thus, we find this theory of liability meritless.
Conclusion
In summation, we find the plaintiffs failed to sufficiently prove to a legal certainty by a preponderance of the record evidence DOTD assumed the duty of RPPJ to construct and maintain the Haines Creek Bridge in conformity with DOTD safety standards as there is no evidence DOTD funded or participated in the construction or maintenance of the bridge. We further find that merely inspecting a bridge as mandated by federal law does not constitute an assumption of duty for maintenance and safety. Finally, we find La.Rev.Stat. 48:35 as written mandates the withholding of funds allocated for construction purposes during a particular non-conforming project for which DOTD funds are allocated and that the statute is not applicable in this case given the absence of evidence establishing DOTD funded the 1980 bridge reconstruction project.

DECREE
For, the foregoing reasons, we reverse the judgment of the court of appeal and render judgment finding DOTD had no liability, thereby dismissing plaintiffs' claim against DOTD, with prejudice.
REVERSED and RENDERED.
JOHNSON, J., dissents.
TRAYLOR, J., concurs in the result.
KNOLL, J., additionally concurs with reasons.
*653 KNOLL, Justice, additionally concurring.
I additionally concur to explain my dissent in Bujol v. Entergy Services, Inc., 03-0492 (La.5/25/04), 922 So.2d 1113, does not affect the issue before this court on the law of assumption of duty. I dissented on grounds that I found no manifest error in the findings of the lower courts.

On Rehearing
WEIMER, Justice.
This court granted a rehearing to address the plaintiffs' alternative argument that, in light of our original opinion in which the State, Department of Transportation and Development (DOTD) was dismissed from the suit,[1] fault should be reallocated between the decedent and the Rapides Parish Police Jury (RPPJ). Finding that the trial court was not manifestly erroneous in allocating forty percent fault to the RPPJ, we will not disturb that factual determination.
In the original opinion this court explained the procedural posture of this litigation at the time these writs were granted. The opinion notes that although there was a bifurcated trial which resulted in inconsistent verdicts, the purpose of the writ grant was to address whether DOTD owed a duty to the plaintiffs, not to address bifurcation and harmonization of the verdicts. (See Hebert v. Rapides Parish Police Jury, No. 2006-2001, 2007 WL 1108851, at *3 n. 4 (La.4/11/07).) Further, the original opinion purposely omits comment on the correctness of the appellate court's harmonizing of inconsistent verdicts, an issue that was raised in the writ applications. (See Herbert, 2007 WL 1108851, at *3 n. 6 and *4 n. 7.) Thus, it was implied that our dismissal of DOTD from plaintiffs' claim eliminated the need to reconcile inconsistent verdicts and left only a determination of whether the trial court's allocation of fault was clearly wrong.
On rehearing, we specifically hold that our dismissal of DOTD from the plaintiffs' suit, coupled with the trial court's finding DOTD was not at fault, removes DOTD from the allocation of fault equation. In effect, the trial against DOTD to the jury has no legal efficacy. The portion of the trial court's allocation of fault subject to scrutiny for manifest error is its allocation of 40 percent fault to RPPJ and the remainder (60 percent) to the deceased driver.

MANIFEST ERROR
The Louisiana Constitution provides that our jurisdiction in civil cases extends to both law and facts. LSA-Const. art. V, § 5(C). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving this court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Ferrell v. Fireman's Fund Insurance Co., 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745. Under this rule, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the factual findings are reasonable in light of the record reviewed in its entirety, *654 a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-883.
When the findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of fact, for only the factfinder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, a reviewing court may well find manifest error even in a finding purportedly based upon a credibility determination. Id. at 844-845. Where such factors are not present, however, and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. at 845. The rule that questions of credibility are for the trier of fact applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Lasyone v. Kansas City Southern Railroad, 00-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693.
These standards for manifest error review are not new. These standards are the guiding principles that aid our review of a trial court's factual determinations. A manifest error review is applicable to the fact-driven determinations presented in this case, and specifically on rehearing, the finding of percentages of fault by the trier of fact. See Clement v. Frey, 95-1119, p. 7 (La.1/16/96), 666 So.2d 607, 610.
In Duncan v. Kansas City Southern Railway Co., 00-0066, pp. 10-11(La.10/30/00), 773 So.2d 670, 680-681, we summarized the standard for reviewing allocation of fault determinations as follows:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement, 666 So.2d at 611; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1977).
Thus, an analogy exists between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court, has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence. Therefore, if an appellate court finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point, respectively, *655 which is reasonably within the trial court's discretion. Clement, 95-1119 at 7-8, 666 So.2d at 610, 611.
We are cognizant of the admonition in Clement that allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the factfinder within that range cannot be "clearly wrong." Foley v. Entergy Louisiana, Inc., 06-0983, p. 32 (La.11//29/06), 946 So.2d 144, 166. "This allocation of shares of negligence, however, is not an easy task for the factfinder, and the Louisiana statute [LSA-C.C. art. 2323] does not describe with particularity how it should be accomplished." Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 971 (La.1985) ("[T]he trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed.").
In Clement, this court held that any allocation of fault falling between a ratio of 50/50 and 75/25 would be reasonable, thus approving a very broad range. Mindful that in quantum determinations, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), affords the factfinder "great, even vast" discretion, we note the Clement analogy mandates that considerable latitude be extended to the trial court in matters of fault allocation. Clement, 95-1119 at 7-8, 666 So.2d at 610, 611.
In the instant case, a ratio of 50/50 would certainly be reasonable; thus, a variation of 10 percent either way would allow a range from 60 percent for the decedent/40 percent for RPPJ to 40 percent for the decedent/60 percent for RPPJ. It is simply not persuasive to argue that the 60 percent fault of the decedent, as found by the trial court, is beyond the range that would also include 50 percent. Although it is possible that a review of the record might support 50 percent as an upper limit of fault allocable to the decedent, such an adjustment would be, on its face, the sort of micro-management of fault allocation by this court which Clement does not contemplate, absent compelling support in the record.
We find nothing in the record to support the plaintiffs' suggestion that the decedent's fault allocation should be reduced and the allocation to RPPJ should be increased. We cannot say that a reasonable trier of fact could not assess the RPPJ's fault at 40 percent.
In this case, in addition to determining that DOTD was not at fault, the district court also determined that both the decedent and RPPJ were negligent and that each bore some degree of responsibility for this tragic accident. The court determined that under the facts and circumstances of this case, an allocation of 40 percent of the fault to the RPPJ was appropriate. The record fully supports this factual determination by the district court.
At the time of trial, the thrust of plaintiffs' claim against the only remaining defendants, DOTD and RPPJ, was that the absence of guardrails at the end of the bridge rails was the primary cause of the driver's death. However, as we noted in our original opinion: "After the impact, the vehicle rolled, coming to rest on the rail overturned with the front of the vehicle projecting, from the bridge outward and suspended precariously above the creek. As a result of metal crush, Katie sustained severe mortal injuries and was tightly "pinned" within the vehicle." Hebert, 2007 WL 1108851, at *3. "While the end of the bridge rail punctured the interior of the car between the front and rear seats, there *656 is no indication in the record the rail pierced [the driver's] body." Id. at *3 n. 1.
Both RPPJ and DOTD countered the plaintiffs' contentions with the argument that the speed of the Hebert vehicle upon entering the curve was the cause of the accident and resulting injuries.
As indicated; the trial court determined DOTD was not at fault. Given this finding of a lack of fault on the part of DOTD, it is apparent that the trial court weighed the evidence to determine the percentages of fault attributable to the only other parties, the deceased driver and RPPJ. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when the trier of fact is clearly wrong or manifestly erroneous. Thus, we apply the manifest error standard of review of this portion of the judgment.
The RPPJ presented the testimony of Joseph D. Blaschke, who was accepted as an expert in accident reconstruction, traffic engineering, and highway design and safety. He testified as to the condition of Philadelphia Road at the time of the accident. The asphalt roadway was dry and dark during the nighttime hours; the lane markings were unclear and defective; the shoulder was defective; and the grade was relatively level.
As to the drop-off, Blaschke noted that it was located at the point where the vehicle left the road and was between six to eight inches in depth. The pavement in the area along the roadway where the decedent exited was "becoming somewhat unraveled." However, there was no drop-off at the point where the vehicle re-entered the roadway.
Upon viewing pictures of the vehicle and the bridge, Blaschke noted that it took significant energy to bend the frame of the vehicle in the manner that it was bent. More significantly, a portion of the concrete structure of the bridge was "uprooted" by the vehicle. The concrete section was 20 to 25 feet in length, and would have probably weighed about the same as the car.
Blaschke gave several opinions concerning the accident. First, that the young driver must have been familiar with Philadelphia Road and, thus, should have exercised caution on the well-worn, relatively narrow and winding roadway.
Second, he concluded the primary factor was the driver's failure to negotiate the curve after she exited the outside of the curve; she overcorrected the vehicle to the left, returned to the pavement area, and then overcorrected back to the right. The vehicle eventually turned sideways and struck the bridge railing. The loss of vehicle control began after the vehicle first exited the paved portion of the road, meaning that the roadway itself did not cause the loss of control. The record contained no evidence that the driver slid off the roadway because of the condition of the roadway itself.
Third, despite the absence of warning signs, if the driver was familiar with the roadway, the presence of the curve should not have surprised her.
Fourth, Blaschke concluded the drop-off really did not cause a loss of control. Because of the significance of the drop-off depth, the driver may have scraped the bottom of the car, but she probably did not experience any "scrubbing" which would have made it difficult to reenter the roadway.
Fifth, the bridge rail was not a typical one, and Blaschke did not know how it would have performed if struck at an angle; *657 there was no guardrail on the approach to the rail.
Finally, Blaschke concluded the driver was traveling at a high rate of speed as she approached the rail. He gave several reasons for reaching this conclusion. The damages to the vehicle indicated a severe impact, including a bending of the frame of the vehicle, which would require a significant impact speed. Also, the vehicle was beginning to overturn when it struck the railing, which was due to the position of the vehicle and speed. As previously mentioned, the impact of the vehicle caused significant damage to the bridge structure that held the railing in place, which damage would not be expected at a low-speed impact. A slower impact speed would have been inconsistent with the damages. Because the vehicle would have slowed after exiting the roadway, the vehicle was probably traveling at a speed higher than the impact speed when it exited.
As an expert, Blaschke opined that if the excessive speed factor were removed, there would still have been an accident, but with less severe damages.
The plaintiffs' witness, Duaine T. Evans, was accepted by the court as an expert in traffic engineering and accident reconstruction. He stated that Philadelphia Road had a "good surface" built from loose aggregate and liquid asphalt that was "binded" together. However, he opined that the absence of traffic signs speed limit or warning signs for the "sharp curve"was a "contributing factor" in causing the accident.
Evans was questioned about the "critical speed" for a vehicle taking this particular curve. He defined the term as the speed at which a vehicle would begin to slide off the road. However, Evans concluded from the evidence that the Hebert vehicle did not slide off the road, thus inferring that it did not reach the critical speed for this particular curve. Parenthetically, we note that if the vehicle did not reach critical speed, the causative effect of the absence of advisory signs is minimized.
In reviewing the testimony of these two experts, it is obvious that they differ in a crucial factthe speed of the Hebert vehicle at the time it reached the curve and left the roadway. Although both experts agree the vehicle did not slide off the road, the plaintiffs' position is that the driver was not exceeding a safe speed while the defendant's expert concluded her speed upon entering the curve was a cause of the accident and her injuries. When a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 845. Thus, we cannot find manifest error in the trial court's apparent acceptance of the defense expert's conclusion and its allocation of a percentage of fault to RPPJ that was less than the percentage of fault remaining to be assessed to the decedent.

CONCLUSION
In sum, we reject the plaintiffs' alternative argument that we should reallocate fault between RPPJ and the decedent driver in light of our dismissal of DOTD from this lawsuit. Additionally, we find no manifest error in the trial court's original allocation of fault.
Finally, we note that the increase in the damage awards made by the court of appeal has become part of the final judgment because RPPJ did not apply for writs to this court following the rendition of that judgment.

DECREE
We affirm the amount of the damage award rendered by the court of appeal, *658 subject to the award against the Rapides Parish Police Jury being limited to 40 percent, as found by the district court. We remand this matter to the district court for a determination of a specific amount of court costs to be paid by the Rapides Parish Police Jury, and for a judgment expressing the award of costs in a dollar amount. See LSA-R.S. 13:5112(A).
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] While the end of the bridge rail punctured the interior of the car between the front and rear seats, there is no indication in the record the rail pierced her body.
[2] According to trial testimony, all roads and bridges are classified as either "on-system," which are on state or federal maintained road systems, or "off-system," which are all other bridges opened to the public, but not on state or federal maintained road systems.
[3] See supra, note 2.
[4] Even though this was a bifurcated trial, resulting in inconsistent verdicts, we did not grant this writ to address bifurcation and harmonization of verdicts, but to address whether DOTD owed a duty to the plaintiffs.
[5] RPPJ did not appeal and is not before this Court; the judgment against it is final.
[6] We are not commenting upon the correctness of the appellate court's harmonizing of the verdicts as we find the issue of DOTD's liability is dispositive.
[7] Because we find these issues dispositive, we pretermit discussion of all other issues, to include the issue of harmonization of the inconsistent verdicts, raised in the applications.
[8] 23 U.S.C. 151 authorizes the establishment of the standards for the proper safety inspection and evaluation of all highway bridges and sets forth the minimum requirements of the standards.
[9] A bridge is defined "as a structure including supports erected over a depression or an obstruction, such as water, highway, or railway, and having a track or passageway for carrying traffic or other moving loads, and having an opening measured along the center of the roadway of more than 20 feet between undercopings of abutments or spring lines of arches, or extreme ends of openings for multiple boxes; it may also include multiple pipes, where the clear distance between openings is less than half of the smaller contiguous opening." 23 CFR 650.301, 260 (1980).
[10] Previously, the standards applied only to "all structures defined as bridges located on any of the Federal-aid highway systems." See 23 CFR 650.301, 270 (1979).
[11] In its preface, the Manual explained its purpose

to serve as a standard and to provide uniformity in the procedures and policies of determining the physical condition and maintenance needs of highway bridges. The procedure for correcting known deficiencies are outside the scope of this manual and no attempt has been made to cover this field. Manual, Preface, at 1.
[12] These observations included but were not limited to (1) approaches, (2) waterways, (3) piers and abutments, (4) bents, (5) stringers, (6) steel girders, (7) concrete girders, (8) bearings, (9) expansion joints, (10) deck, (11) curbs, (12) sidewalks, (13) bridge railings, (14) barrier railing, (15) trusses (steel), (16) trusses (timber), (17) movable bridges, (18) suspension span, (19) signs, (20) encroachments, (21) aesthetics, (22) general observations. Manual, Sec. 2.4.2 at 5-15.
[13] The information at a minimum necessary to compile these reports included (1) the bridge number, (2) date of investigation, (3) the full name of the bridge, (4) the location, (5) description, (6) skew angle, (7) the number of spans and the span lengths, (8) the over-all length, (9) roadway width, (10) surfacing, (11) sidewalks, (12) railing, (13) alignment, (14) traffic lanes, (15) design live loading, (16) waterway, (17) other features crossed, (18) clearances, (19) date built, (20) plans, (21) plans and dimensions if plans not on file, (22) bridge inspection report, (23) restrictions, (24) miscellaneous, (25) stress analysis, (26) paint record, (27) signature, (28) channel profile, (29) encroachments, (30) environmental conditions, (31) federal aid system, and (32) average daily traffic. Manual, Sec. 3.2.2 at 18-21.
[14] This information included the location, bridge type, bridge name, year built, bridge length, roadway width and surface, average daily traffic, structure number, date of inspection and date of the next inspection, specifics of the deck, specifics of the superstructure, which included the bearings, girders, stringers, and trusses, the condition of the substructure, which included the abutments, bents, and piers, the condition of the traffic services, the waterway, the approach, movable spans, and general notes and remarks.
[15] La.Rev.Stat. 48:757 provides, in pertinent part:

A.(1) The Department of Transportation and Development shall perform no work on the parish road system or on any other roads or streets which are not in the state highway system, whether such work is construction or maintenance and whether the work is done at the expense of the state or at the expense of the governing authority of the parishes, except in the following circumstances:
(a) The department shall construct, maintain, and improve roads, whether hard surfaced or otherwise, within state parks and state historic sites as defined in R.S. 56:1684, and connect such sites with existing highways.
(b) The department is authorized to perform work on any off-system bridge which is included as a TIMED project within the provisions of R.S. 47:820.2(B)(1)(b).
(c) The department is authorized to perform work on intersectional improvements on parish roads or municipal streets and to perform work on parish roads or municipal streets for purposes of operational or safety reasons when the parish road or municipal street intersects with a state highway which is programmed for improvement or construction; however, the distance of such off-system work shall conform to AASHTO design standards as adopted
* * *
C. In addition, in instances in which the federal government has established programs pertaining to off-system construction, maintenance, or improvement, the department may participate in said projects and provide necessary matching funds including but not limited to monies in the Transportation Trust Fund. Funding for programs under the provisions of this Subsection shall be subject to the availability and appropriation of funds in excess of the total funds appropriated for the Parish Transportation Fund in Fiscal Year 1994-1995.
Circumstances giving rise to the exceptions to the prohibition do not exist in this case.
[16] This is the version of the statute the district court allowed submitted to the jury. Notably, in 1984, the second paragraph of this statute was amended to state that "payment of any funds allocated to the political subdivision for the construction purposes shall be withheld. . . ." 1984 La. Acts No. 625, § 1. This language does not affect our interpretation of the provisions, but rather, further bolsters our finding that the required withholding of funds applies to the particular construction project, as "the" is even more definitive than "such." See infra. Prior to the accident at issue, the withholding provisions had not otherwise been amended.' Nevertheless, our interpretation requires the application of the statutory provisions in effect at the time of construe.; tion. Additionally, the 1986 amendment substituted "highway and bridge design" for "highway design" in the first sentence. La. Acts 1986, No. 119, § 1.
[17] Because the statute is not applicable, we do not address whether DOTD can be held liable for personal injuries based on DOTD's failure to withhold funds for specific construction projects under the statute.
[1] When we granted the writ application filed by DOTD, we also granted the writ application of the plaintiffs, Hebert v. Rapides Parish Police Jury, 06-2164 (La.11/9/06), 941 So.2d 29.