986 So.2d 852 (2008)
Mary PORTER, Plaintiff-Appellant
v.
MONROE HOUSING AUTHORITY, Defendant-Appellee.
No. 43,202-CA.
Court of Appeal of Louisiana, Second Circuit.
June 4, 2008.
Rehearing Denied August 7, 2008.
*854 Johnson & Placke, L.L.P., by Allan L. Placke, West Monroe, for Appellant.
Voorhies & Labbé, by Cyd Sheree Page, Lafayette, for Appellee, Monroe Housing Authority.
Breithaupt, Dunn, Dubos, Shafto & Wolleson, LLC, by Walter C. Dunn, Monroe, for Appellee, Commercial Pest Mgmt. & American Safety Risk Retention Group, Inc.
Before CARAWAY, PEATROSS and MOORE, JJ.
*855 MOORE, J.
Mary Porter appeals a jury verdict and JNOV which found her 60% at fault for the aggravation of her chronic obstructive pulmonary disease ("COPD") and awarded special and general damages for exposure to termite poison at her housing complex. For the reasons expressed, we affirm.

Factual Background
The 69-year old Ms. Porter lived in Passman Plaza Retirement Community, a set of 4-plex apartments for senior citizens, owned by the City of Monroe and managed by Monroe Housing Authority ("MHA"). Passman is not a nursing home or assisted living center, but accepts only seniors of limited means. Ms. Porter had been a heavy smoker for much of her life, and now suffers from a heart condition and COPD with periodic flare-ups. She testified that about two months before this incident, she had been hospitalized for pneumonia; she was still on antibiotics via nebulizer four times a day and receiving daily visits from home health. Her doctors advised her to stay out of smoky places. She admitted that monthly pest treatment at Passman had never bothered her.
MHA used Commercial Pest Management for monthly pest service at Passman, and in June 2003 granted it a contract for post-construction termite treatment in each unit. In addition to outdoor work, this involved entering each unit's bathroom, drilling a hole in the floor near the bathtub, filling it with one gallon of Permethrin TC, a termite poison, and placing a grate over the hole. Commercial Pest's owners testified that Permethrin TC is the safest pyrethroid in general use and the same substance they use monthly, only in higher quantity for termites.

Synopsis of Trial Testimony
On June 19, 2003, Commercial Pest came to treat Ms. Porter's apartment. According to Ms. Porter, nobody from MHA or Commercial Pest gave her any advance notice; she was in the apartment with her granddaughter and a friend, Sophia Boudreaux, when a young man knocked on the door and said he was there to "spray for termites." Ms. Porter asked him not to spray because of the breathing machine in plain view at the end of the couch, but he replied he had to do so because of the contract. He went into the bathroom, drilled, poured in the poison, and told Ms. Porter the smell would be gone in 15 minutes. Ms. Porter went to the washateria and grocery store; when she returned, her granddaughter Casey Parker was pulling up. Entering the apartment, they noticed a strong chemical scent; Casey went into the bathroom, finding the heater turned on and a puddle of chemical around the hole in the floor. Ms. Porter opened the windows and doors, turned on the air conditioner, and thought nothing more of it, but that night she woke up gasping for breath. She called her family doctor, Dr. Matthew George, who phoned in a prescription for an antibiotic, but this did not help. The following Monday, June 23, her O2 saturation level was down to 10%; Dr. George put her in Glenwood Regional Medical Center for two weeks. Shortly after this, she moved out of Passman. She testified that since this incident, her breathing has been very poor, she has used oxygen and antibiotics daily, and her activities are seriously curtailed. She admitted, however, still making periodic trips to the casinos in Vicksburg.
Sheila Poole, Ms. Porter's daughter, was not present when the termite treatment occurred, but arrived about 2 pm, thought the apartment had a strong chemical smell, and saw liquid on the bathroom *856 floor. She testified that since this incident, her mother cannot vacuum or mop her own floor, and has to use canned oxygen all the time. Casey Parker, Ms. Porter's granddaughter, confirmed that she arrived at the apartment right after the treatment; she saw a spill on the bathroom floor and found the heater turned on. She turned on the air and opened windows to alleviate the smell.
Marshall Douglas, co-owner of Commercial Pest, testified that he did the inside treatment on Ms. Porter's building. He recalled neither Ms. Porter nor her telling him not to proceed because of her breathing problems; he would have remembered this because a different Passman tenant had presented a doctor's excuse and MHA placed her in a motel for 24 hours after the treatment. He denied spilling any Permethrin TC on the floor; if this had happened, he would have followed state regulations and wiped it up. He denied turning on anybody's bathroom heater in June, and testified that if asked, he would have advised tenants not to turn on heat or air for 24 hours after the treatment. He did not know if MHA advised tenants about the termite treatment, but he felt this was likely as virtually everybody had cleared out their hall closets as requested.
Douglas's partner, James Volentine, confirmed that he notified MHA of what dates they would be treating Passman units, but was unsure if or how MHA notified the tenants.
David Smith, an expert in pest control, testified that Commercial Pest's protocol for post-construction termite treatment met all state and federal regulations, that Permethrin TC was the safest termite poison in use, that he had never heard of anybody getting sick from exposure to it, and that Ms. Porter's name was not on the Louisiana State Registry for Pesticide-Sensitive Individuals.
Dan DeJarnette was MHA's administrative assistant in charge of pest control; he testified that nobody from Commercial Pest advised him that tenants with breathing problems should leave their apartments after these treatments. He had no personal contact with tenants, but notified the apartment manager of the upcoming treatments. Frank Wilcox, MHA's executive director, confirmed that he had no knowledge of either Ms. Porter's health problems or warnings about the termite treatment.
Joanne Crone, the apartment manager, testified that Passman was not a nursing home or assisted living facility. She confirmed that one other tenant had submitted a doctor's excuse not to spray her unit for pests; they put her in a motel for the day. Ms. Crone usually advised tenants of the dates of pest service in the monthly newsletter slipped under each door, but she did not recall mentioning this particular termite treatment. Nobody told her that tenants should vacate their apartments for 24 hours after the treatment, and Ms. Porter never told her of any breathing problems until after this incident. Ms. Crone was certain, however, that several months later (on February 15, 2004, her nephew's birthday) she was at Horizon Casino in Vicksburg and saw Ms. Porter in the dollar slots area, which is "always smoky." According to Ms. Crone, Ms. Porter was looking good and not carrying an oxygen tank, but said she was not really doing well.[1]
Sophia Boudreaux, an old friend of Ms. Porter's, denied that she was at the apartment *857 when the pest man came. She admitted telling Ms. Porter that she "ought to sue" somebody about this, but denied offering to testify on her behalf. She related that she and Ms. Porter used to go to the casinos often, including "the Friday and Saturday * * * before she called me and told me that she was in the hospital." She admitted that she refused to testify when contacted by plaintiff's counsel because she "wasn't there" when it happened. She also admitted that sometime after this incident, she received approval from MHA to move into a two-bedroom unit at the new retirement center, Chauvin Pointe Phase 2, just north of Bayou DeSiard. She insisted this was no quid pro quo from the MHA to silence her testimony; Mr. Wilcox confirmed that this upgrade was available to all Passman residents.
Ms. Porter's family doctor, Dr. Matthew George, testified that he (and his wife, who is his medical partner) had been treating Ms. Porter since 2000 for heart and lung problems, seeing her three or four times a year for COPD and related symptoms. On June 19, 2003, he phoned in a prescription for an antibiotic, but this failed to help, and Ms. Porter came to his office with an 87% O2 saturation level, so he admitted her to Glenwood for 17 days. He testified that her symptoms were consistent with chemical exposure, but said that other things can exacerbate COPD, like exposure to cigarette smoke. He had not seen Ms. Porter since her discharge on July 9, 2003. He would not comment on her current condition, but stated that if she was still using oxygen, it could be related to the termite treatment or just the natural progression of COPD.
Dr. Ronald Hammett, a pulmonary physician, had seen Ms. Porter once before in 2001. In June 2003, on a consult from Dr. George, he saw her at Glenwood for shortness of breath, wheezing, fever and cough; he testified that a person with COPD could have this reaction from chemical exposure. The incident was "acute exacerbation of her lung disease" which he attributed to chemical exposure. He treated her about two months after she left Glenwood, prescribing home oxygen for use during exertion or sleeping. He had no idea of her condition since September 2003, and admitted that even without this incident, she could expect periodic flare-ups of the symptoms she exhibited in June 2003. He also stated that for most people, the effect of chemical exposure is "usually short-term."
Ms. Porter testified that she started seeing a Dr. Roy in September 2003, but she did not offer his deposition or medical records into evidence.

Procedural History
Ms. Porter sued MHA, Commercial Pest and their respective insurers, alleging that termite control is an ultrahazardous activity and that as a result of their conduct, she suffered a permanent lung disability. The defendants responded that they breached no duty to Ms. Porter and, at any rate, she failed to mitigate her damages.
At jury trial in January 2007, the witnesses testified as outlined above. The parties stipulated that Ms. Porter's recoverable medical expenses through trial totaled $14,810.09,[2] but the defendants stipulated only the total, not that all of them resulted from exposure to termite poison.
The jury rendered a verdict allocating fault 25% to MHA, 15% to Commercial Pest, and 60% to Ms. Porter "in the exacerbation of plaintiff's COPD." The jury awarded the stipulated medical expenses of $14,810.09 and loss of enjoyment of life *858 of $5,000, but denied all other general damages.
Ms. Porter moved for JNOV, urging that the denial of general damages was legal error under Wainwright v. Fontenot, XXXX-XXXX (La.10/17/00), 774 So.2d 70, and the allocation of fault was "strongly and overwhelmingly" excessive under Anderson v. NOPSI, 583 So.2d 829 (La. 1991). After a hearing, the district court ruled that on the record, no rational jury could deny that Ms. Porter suffered an "acute exacerbation" of COPD, resulting in pain and suffering; for this it awarded an additional $15,000. However, the medical evidence did not preponderate that all her post-incident symptoms resulted from chemical exposure, and Ms. Porter subjected herself to the "smoke filled environment" of casinos, so the court declined to adjust the allocation of fault.
The final judgment ordered MHA and Commercial Pest to pay her $8,702.52 and $5,221.52 respectively. Ms. Porter has appealed, raising four assignments of error.

Discussion: Allocation of Fault
By her first assignment of error, Ms. Porter urges the finding that she was 60% at fault in the exacerbation of her COPD was plainly wrong. Under the comparative principles of Watson v. State Farm, 469 So.2d 967 (La.1985), she can be no more than 10% at fault. She reiterates that she told the exterminator not to treat her apartment because of her breathing problems, but he did it anyway, assuring her that after one hour she would be unable to tell he was ever there; when she returned, the bathroom heater was turned on, diffusing the poison through the whole apartment. Both Commercial Pest and MHA were aware of the danger that an elderly person with COPD faced if exposed to termite poison, and both failed to advise her of it. She submits she is completely without fault, like the plaintiff in Sandbom v. BASF Wyandotte, 95-0335 (La.App. 1 Cir. 4/30/96), 674 So.2d 349, who, following his employer's instructions and without any protective gear, entered and cleaned a tank contaminated with a cyanide compound. Also, there was no substantial evidence that she failed to mitigate her damages; Ms. Boudreaux's claim to have seen her at a casino the very night of her injury is utterly incredible, as she was at home sick, getting medicine delivered to her apartment. Finally, neither doctor ascribed her flare-up to casino visits, and the testimony of Ms. Boudreaux and Ms. Crone was pure speculation. She suggests she is without fault, or at most 10% at fault.
The defendants respond that Ms. Porter's arguments are based solely on her own testimony, but her credibility was so challenged that the jury could rationally disbelieve her. Specifically, the jury could accept Ms. Boudreaux's account of seeing Ms. Porter in a casino the night of the termite treatment; exposing herself to a smoky environment supports the allocation of fault. Moreover, Ms. Porter never advised anyone at MHA that she had serious respiratory disease, and the jury could easily find that her failure to do so was the predominant cause of the injury.
A trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Hebert v. Rapides Parish Police Jury, XXXX-XXXX (La.1/16/08), 974 So.2d 635 (on rehearing). The issue for the reviewing court is not whether the trier of fact was right or wrong, but whether its conclusion was a reasonable one. Id. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *859 Id.; Stobart v. State, 617 So.2d 880 (La.1993).
When the findings of fact are based on determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the findings, for only the factfinder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Hebert v. Rapides Parish Police Jury, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989). When documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that no reasonable factfinder would credit it, the reviewing court may well find manifest error even in a finding purportedly based upon a credibility call. Id. However, when such factors are not present, and the finding is based on the factfinder's decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or plainly wrong. Id. Manifest error review applies to the percentages of fault assigned by the trier of fact. Hebert v. Rapides Parish Police Jury, supra; Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607.
If a person suffers injury, death or loss as a result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss. La. C.C. art. 2323. In assessing comparative fault, the courts consider (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the parties, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Hebert v. Rapides Parish Police Jury, supra; Watson v. State Farm, supra.
The issues here are entirely factual and subject to manifest error review. Ms. Porter testified that the apartment manager, Ms. Crone, was aware of her breathing problems because earlier in 2003, when Ms. Porter was in the hospital with pneumonia, the tenants' club (of which Ms. Crone was a member) sent her a get-well card. Ms. Crone, however, testified that she was not actually a member of the tenants' organization, and although it did send cards to sick members, she did not recall that Ms. Porter had been in the hospital. She had no inkling that Ms. Porter suffered from COPD, a point corroborated by MHA's executive director, Wilcox, and his administrative assistant, DeJarnette.
Ms. Porter also testified that when the exterminator came to "spray" for termites, she asked him not to, because of her breathing equipment. Mr. Douglas, however, recalled no such request and saw no such equipment when he worked Ms. Porter's unit. He would have remembered it, as a different resident had asked to be relocated on the date of the treatment, owing to health problems.
From this evidence, a rational factfinder could reasonably conclude that Ms. Porter failed to advise either MHA or Commercial Pest that she had severe respiratory problems that would be aggravated by exposure to termite poison.
Significantly, Commercial Pest's expert in termite and pest control, David Smith, testified that Permethrin TC had the lowest warning level, "Caution," of any termite poison. He explained that if he knew *860 anyone in the treatment area had a lung condition, this would be a "red light": he would recommend that person leave the building for 24 hours, but no regulation or manufacturer's label required this. Ms. Porter presented no evidence, expert or otherwise, to contradict Mr. Smith. Her assertion that Permethrin TC is "ultrahazardous" is not supported by the record. The case of Sandbom v. BASF Wyandotte, supra, cited by Ms. Porter, involved an unquestionably toxic cyanide compound in an enclosed tank, and has no bearing on the instant case.
Ms. Porter correctly shows that her physicians, Dr. George and Dr. Hammett, established that someone in her conditionCOPD with recurrent breathing problemsis at elevated risk from exposure to certain chemicals. They agreed that her symptoms and 17-day stay in Glenwood likely resulted from her exposure to Permethrin TC. In short, a rational jury could ascribe some fault to the defendants. The principles of comparative fault plainly applied. La. C.C. art. 2323.
Under the factors of Watson v. State Farm, supra, Ms. Porter had a superior awareness of her risk, yet failed to inform the defendants of her special health needs. Simple notice to either defendant, could have averted this incident. The risk involved in the use of Permethrin TC, for most of the population, appears to be minor, and the significance of protecting publicly owned property from termite damage is unquestioned. As for the parties' relative capacities to act, it appears that MHA had some opportunity to learn about Ms. Porter's condition, but was not obligated to monitor each tenant's health. No extenuating circumstances are apparent. On this record, a rational juror could reasonably find that Ms. Porter's failure to act translated to a 60% share of fault. This allocation is within the permissible range and not an abuse of discretion. Hebert v. Rapides Parish Police Jury, supra; Clement v. Frey, supra.
This assignment of error lacks merit.

Deficiency of JNOV
By her second assignment, Ms. Porter urges the court committed legal error in refusing to accept the jury's finding that the chemical exposure caused her to use oxygen for 3½ years. The jury awarded her full medical expenses, $14,810.09, including charges for oxygen through the date of trial; hence, she contends, the jury found 3½ years' injury. The court properly granted JNOV under Wainwright v. Fontenot, supra, but then committed legal error, requiring de novo review, by applying credibility calls and adverse inferences to render an award of only $15,000 in general damages. She cites several asbestosis cases such as Sandbom v. BASF Wyandotte, supra, with damages in the $250,000 to $450,000 range. She suggests that for 17 days in the hospital and 3½ years on oxygen, she is entitled to general damages of $125,000.
The defendants respond that the jury was given only a total of stipulated medical expenses with no special instructions on how to break them down; the jury may have awarded the full amount only because it understood the total would be reduced by Ms. Porter's share of fault, so there was no error. Further, neither doctor who testified had seen Ms. Porter since September 2003, three months after the exposure, and could not comment on her subsequent condition; there was simply no medical basis to ascribe her 3½ years' use of oxygen to the this incident.
Notably, the defendants do not contest the district court's grant of JNOV. In general, it is error for a jury to award special damages for medical expenses while at the same time denying general *861 damages. Wainwright v. Fontenot, supra; Green v. K-Mart Corp., 2003-2495 (La.5/25/04), 874 So.2d 838. The JNOV is appropriate when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. La. C.C.P. art. 1811; Joseph v. Broussard Rice Mill, XXXX-XXXX (La.10/30/00), 772 So.2d 94. JNOV is the proper procedural device to correct a jury verdict that fails to award damages that have been clearly proved. Smith v. State, XXXX-XXXX (La.3/11/05), 899 So.2d 516.
The district court conducted a de novo review of the record and found that the defendants' conduct resulted in an acute exacerbation of Ms. Porter's COPD. The court was unable to find, however, "that the medical evidence establishes by a preponderance of the evidence or to a medical certainty that conditions claimed to have been suffered by her years after the exposure were * * * causally related sufficiently for me to consider an award of damages for long term effects." This is an accurate assessment of the medical evidence; Dr. Hammett described her condition as "acute" and expected it would be "short term," and both doctors declined to comment on her condition over three years after they last saw her. The district court also noted that Ms. Porter went to casinos, with their smoke-filled environment, and this may have contributed to her ongoing problems. The court could take this as a breach of the plaintiff's duty to take reasonable steps to mitigate her damages. Aisole v. Dean, 574 So.2d 1248 (La.1991); Sepulvado v. Turner, 37,912 (La.App. 2 Cir. 12/10/03), 862 So.2d 457, writ denied, XXXX-XXXX (La.3/19/04), 869 So.2d 855.
In short, we find the district court conducted an appropriate de novo review of the record in ruling on Ms. Porter's motion for JNOV. There is no need for further de novo review. This assignment of error lacks merit.

General Damages
By her third assignment, Ms. Porter urges that even if there was no legal error, the award of $15,000 in general damages was abusively low for chemical exposure requiring 17 days' hospitalization and 3½ years' use of oxygen. For her symptoms, she submits the lowest affirmable award would be $75,000. By her fourth assignment, she contends the jury's award of $5,000 for loss of enjoyment of life was abusively low. She has had to curtail many activities: Parents Without Partners, VFW dances, family vacations to Arkansas, household chores. She cites several cases, including Simms v. Progressive Ins. Co., 38,804 (La.App. 2 Cir. 9/29/04), 883 So.2d 473, writ denied, 2004-2871 (La.1/28/05), 893 So.2d 78, in which this court reduced an enjoyment of life award from $225,000 to $50,000 for a pedestrian who was struck by a car. She submits the lowest affirmable award would be $35,000.
The defendants respond that in the two years prior to this incident, Ms. Porter was hospitalized at least three times for symptoms identical to those she now describes; the jury could reasonably find only a brief exacerbation. Commercial Pest contends that the asbestosis cases are inapposite and the JNOV of $15,000 was, if anything, "on the high end." Both defendants urge that because of Ms. Porter's serious preexisting condition and shattered credibility, the award for loss of enjoyment of life was no abuse of discretion. MHA also shows that the plaintiff in Simms had no prior disability; hence that case and the others cited by Ms. Porter are not apposite.
General damages are those which may not be fixed with pecuniary exactitude; instead, they involve "mental or physical pain or suffering, inconvenience, *862 the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Kaiser v. Hardin, 2006-2092 (La.4/11/07), 953 So.2d 802. In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion is left to the judge or jury. La. C.C. art. 2324.1; Kaiser v. Hardin, supra. The role of the appellate court in reviewing awards of general damages is not to decide what it considers an appropriate award, but rather to review the exercise of discretion of the trier of fact. Id.; Hae Woo Youn v. Maritime Overseas Corp., 92-3017 (La.9/3/93), 623 So.2d 1257, cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The initial inquiry is whether the trier of fact abused its vast discretion in assessing the amount of damages. Kaiser v. Hardin, supra; Reck v. Stevens, 373 So.2d 498 (La.1979). Only after finding that the trier did in fact abuse its great discretion may the appellate court resort to prior awards, and then only to determine the highest or lowest point reasonably within that discretion. Kaiser v. Hardin, supra; Coco v. Winston Industries Inc., 341 So.2d 332 (La.1976).
A defendant takes his victim as he finds her and is responsible for all natural and probable consequences of his tortious conduct; where his action aggravates a preexisting condition, he must compensate the victim for the full extent of her aggravation. Touchard v. Slemco Elec. Found., 99-3577 (La.10/17/00), 769 So.2d 1200; Edwards v. LCR-M Corp., 41,125 (La.App. 2 Cir. 7/12/06), 936 So.2d 233.
In ruling on the JNOV, the district court held the medical evidence would not support a finding that Ms. Porter's use of oxygen and prolonged respiratory complaints all arose from chemical exposure. We are constrained to find that this is not plainly wrong. On cross-examination, Dr. George disclosed that Ms. Porter had come to him with complaints of shortness of breath and related symptoms four times in 2001, three times in 2002, and three times before June 2003; he agreed her symptoms were "gradually increasing." As noted, Drs. George and Hammett did not see her after September 2003 and would not comment on her subsequent symptoms. Further, although Ms. Porter disputed the details, Ms. Crone and Ms. Boudreaux reported seeing her in a Vicksburg casino on two occasions after the termite treatment; willing exposure to a notoriously smoky environment may also account for her continued symptoms.
This record shows an acute exacerbation of COPD requiring 17 days in Glenwood and roughly three months of medical attention, followed by a return to her prior condition. The award of $15,000 in general damages is not an abuse of the district court's discretion.
Loss of enjoyment of life, also called hedonic damages, refers to the detrimental alterations of a person's life or lifestyle, or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed. McGee v. A C and S, Inc., XXXX-XXXX (La.7/10/06), 933 So.2d 770. It is compensable as a separate item of damages. Id. The award, if any, depends on the particular facts of the case and should be left to the trial court's great discretion. Id.; Crisler v. Paige One Inc., 42,563 (La.App. 2 Cir. 1/9/08), 974 So.2d 125.
Ms. Porter described, and her family members corroborated, various activities dancing, family vacations, household choresthat she can no longer enjoy. These deprivations, however, must be balanced against her diminished respiratory capacity before the chemical exposure and the inexorable progression of COPD. Ms. *863 Porter was not overall healthy and vigorous, and did not sustain the level of disability present in Simms v. Progressive Ins. Co., supra, Basco v. Liberty Mutual Ins. Co., XXXX-XXXX (La.App. 3 Cir. 8/17/05), 909 So.2d 660, and the other cases cited in brief. On this record, we cannot find that the jury abused its discretion in the award of general damages. These assignments of error lack merit.

Conclusion
For the reasons expressed, the judgment is affirmed. Mary Porter is to bear all costs.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, CARAWAY, PEATROSS, MOORE and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] Ms. Porter admitted seeing Ms. Crone at Horizon Casino, but insisted they met in the smoke-free dining area, where she was seated next to her oxygen tank and surrounded by family members.
[2] This represented the sum of Medicare and Medicaid liens.