DREW, J.
 

 |,Ted and Trudy Malant, plaintiffs in this medical malpractice action against the Louisiana Patient’s Compensation Fund (“PCF”), appeal from the Judgment Notwithstanding the Verdict (“JNOV”) granted by the trial court after the jury totally rejected plaintiffs’ demands. The Malants sought to recover for damages allegedly sustained when the doctor operated on the wrong knee. Nominal defendants were Dr. John Mays and the Willis-Knighton Pierremont Health Center (“WK”). Dr. Mays admitted he erroneously operated on Mr. Malant’s right knee when he intended to treat Malant’s left knee with arthroscopic surgery.
 

 The Malants complained on appeal that the trial court abused its discretion in awarding inadequate damages for past lost wages, past medical expenses, and pain and suffering. Additionally, plaintiffs contended that the trial court erred in failing to award future lost wages and future medical expenses for Mr. Malant and loss of consortium for Mrs. Malant. Also at issue were the refusals of the trial court to admit into evidence the medical bill of Dr. Jerry Marlin and to award the Malants all court costs and all costs of prosecuting the action. The judgment of the trial court is affirmed in all respects.
 

 PROCEDURAL BACKGROUND
 

 Prior to the trial, the plaintiffs settled with Dr. Mays for $50,000, triggering the PCF statutory credit of $100,000 and party status in the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41,
 
 et seq.
 
 Later, the Malants settled with WK for $56,000. The settlement was approved by the [ 2district court, giving the PCF a total statutory credit of $150,000.
 
 [1]
 
 Plaintiffs continued the litigation against the PCF, alleging their damages exceeded $156,000.
 

 Following a week-long trial, the jury denied any recovery to the Malants. In response to the jury interrogatories, the jury answered “No” to each of the following questions:
 

 1. Have the plaintiffs established by a preponderance of the evidence that the actions of Dr. Mays were a substantial factor in causing harm to Mr. Malant?
 

 2. Have the plaintiffs established by a preponderance of the evidence that the actions of the employees of Willis Knighton Pierremont Center were a substantial factor in causing harm to Mr. Malant?
 

 Plaintiffs filed a Motion for a New Trial which was denied by the trial court and a Motion for JNOV which was granted by the trial court with this explanation:
 

 At the trial the jury found for the defendant, the Louisiana Patient’s Compensation Fund. After review of the evidence, the Court is granting the Motion for Judgment N.O.V. It denied the Motion for New Trial and finds negligence on the part of Dr. John Mays. It is undisputed that Dr. Mays operated on the wrong leg of the plaintiff and Dr. Mays admitted that fact at trial. Still the facts show that the damage was minimal and not of long duration. At the trial the jury unanimously found that the defendant
 
 [2]
 
 had no credibility as to
 
 *1061
 
 the extent of his injury and the Court is in total agreement with this finding. In awarding damages for the plaintiff, the Court grants only the following damages. (Emphasis added.)
 

 • $40,000 pain and suffering,
 

 • $10,000 loss of income,
 

 |,s* $11,033.94 the stipulated amount of medical expenses for physical therapy and care by Dr. Liu, and
 

 • court costs to be divided equally between the parties.
 
 [3]
 

 All the damages were subject to the credit of $150,000 resulting in the Malants receiving no money beyond that obtained from the pretrial settlements. The Malants appealed.
 

 FACTUAL BACKGROUND
 

 Married in August 2003 to Trudy, Ma-lant had been employed as a heating and air conditioning technician at $18.00 per hour beginning approximately August 23, 2003. While engaged in this employment on March 3, 2004, Malant was in a serious, high-speed vehicular crash, resulting in a fatality. According to Malant, he was traveling about 60 to 65 MPH on a highway when a driver pulled into his path. Malant testified he was in and out of consciousness and had to be extracted from the wreckage with the Jaws of Life. Ma-lant sustained a broken left thumb, a torn medial meniscus
 
 [4]
 
 in his left knee, bruising, and a fractured neck vertebra. He was transported to LSU Health Sciences Center, where he was hospitalized for two or three days.
 

 On March 8, 2004, he first saw Dr. Mays at the Highland Clinic. Dr. Mays treated him on several occasions over the next few weeks. The doctor obtained an MRI of Malant’s left knee which showed the torn meniscus of the left knee and a mass behind the left knee in the popliteal fossa (hollow |4behind the knee). Because the location and appearance of the mass indicated it could have been cancerous, Dr. Mays scheduled Malant for two surgeries on his left knee: (1) repair of the torn meniscus, and (2) removal of the mass to rule out cancer. Malant consented to both procedures.
 

 On May 17, 2004, Dr. Mays erroneously performed procedures on the right knee. When the doctor arrived in the operating room, the right leg had been prepped and draped. When he began the arthroscopic procedure, the doctor encountered a torn meniscus which he expected to find; he made repairs to the posterior horn of the medial meniscus and debrided approximately 10% of the total meniscus. The doctor discovered he was doing surgery on the wrong knee when he opened the rear of the right knee and found no mass. Dr. Mays stopped the procedure and went into the waiting room where he informed Mrs. Malant of his error and obtained her permission to perform the surgeries on the left leg while Mr. Malant was under general anesthesia.
 

 Following the surgery, Malant had physical therapy but did not progress. At various times, he obtained and utilized walkers, a power wheelchair through his primary care physician, and a cane to assist the right leg.
 

 As a result of the mistaken surgery, the Malants alleged that Malant’s right
 
 *1062
 
 knee and leg did not heal properly. Plaintiffs asserted that Malant had continuous problems with his right knee and right popliteal fossa including right knee pain, decreased range of motion, sense of instability of the right knee, antalgic gait (limp), insomnia, impaired ability to work, limp-induced Rback pain with a herniated disc, and loss of consortium with his wife. The Malants also alleged that he had left knee pain secondary to an aggravated or retorn left meniscus. According to Ma-lant, he had no symptoms in his right leg prior to Dr. Mays’ surgery.
 

 In Malant’s opinion, his right leg did not improve and at his sister’s recommendation, he saw Longview orthopedist, Dr. Liu, on June 21, 2004. Dr. Liu found “no effusions” (seepage of fluid into surrounding tissue) and “no instability in the right knee.” Malant had full extension of the right knee and did not go into reeurvatum (backwards bend) in the right knee. He ordered an MRI which revealed:
 

 A small effusion is evident in the supra-patellar bursa. Extensive myxoid
 
 [5]
 
 degeneration is noted involving the posterior horn of the medial meniscus. An obliquely oriented tear is noted extending to the undersurface of the posterior horn of the medial meniscus.
 

 Dr. Liu’s notes from the June 28, 2004, visit stated that in reviewing the MRI with the Malants, the doctor stressed that the MRI did not show whether the tear was old or new, whether it was repaired and then retorn, or whether it was a pre- or post-operative problem. Dr. Liu explained to the Malants that the arthroscopy would not necessarily explain the age or cause of the tear. Based on Malant’s continuing pain, Dr. Liu recommended a diagnostic arthroscopic exam with repairs if appropriate. They discussed the possibility that Malant was “developing a complex regional pain syndrome with pain that is out of ordinary for the length of time or for the degree of pathology encountered.”
 

 |fiDr. Liu performed surgery on Malant’s right knee on June 30, 2004. Dr. Liu’s operative report stated his final postoperative diagnosis was “right knee pain, possible meniscal tear with evidence of previous partial menisectomy.” While Malant was sedated for surgery, Dr. Liu examined his right knee and found:
 

 no instability to medial or lateral stress. There was a negative Lachman and negative pivot shift.... Inspection of the patellofemoral joint with probing confirmed no chondral Assures or flap tear. There was some roughening of the medial femoral condyle but no displaceable tears.
 

 [[Image here]]
 

 Probing of the meniscus showed no dis-placeable flap tears. There was some foreshortening and roughening of the inner edge of the posterior third of the medial meniscus consistent with previous arthroscopic partial menisectomy. Probing this confirmed that the rim was stable with only minimal fibrillation. The fibrillated areas were debrided with articular shaver but felt to be clinically insignificant. There were no other lesions of the posterior horn of the medial meniscus.
 

 The ACL was probed and found intact. The lateral compartment was carefully inspected and probed and the meniscus and articular cartilage was normal. A final sweep of the joint showed no further pathology.
 

 Although he saw Dr. Liu several times post-surgery, Malant concluded that his right leg was worse. Malant testified he was suspicious of Dr. Liu and maintained
 
 *1063
 
 that Dr. Liu’s records did not accurately reflect his complaints, which Dr. Liu substantially downplayed. The Malants characterized as “untrue” Dr. Liu’s notation of July 9, 2004: “Subjectively he feels better.”
 

 Malant last saw Dr. Liu on September 1, 2004. His examination revealed that Ma-lant had good range of motion with no recurvatum or hyperextention. Dr. Liu found “no evidence of cruciate laxity” with the |7knee “stable” with “no crepitance” (grating, cracking or popping sounds in joint). As to the brace, Dr. Liu opined he did not feel that Malant needed a brace other than for proprioceptive (relating to or being stimuli originating within an organism) support or psychological support. The doctor released Malant to return to work and told him his right knee was fíne. Dr. Liu stated there was no reason he would not expect Malant to have normal activity with a return to work and daily living. Because Malant had a return to good function of the right knee, Dr. Liu placed no restrictions on Malant’s release.
 

 Since Malant felt he was getting worse, not better, Malant’s attorney referred him to Dr. Turgeon in Dallas, where Malant next sought treatment. Initially, the doctor made an extensive examination and noted Malant was hypersensitive to pain around the right knee. The doctor’s impression was “right knee pain, uncertain etiology.” Among possible causes of the pain were atypical RSD (Reflex Sympathetic Dystrophy), persistent post-menisec-tomy pain or some type of radicular symptoms. The doctor ordered a number of tests including an MRI and a bone scan. In addition, he prescribed a hinged knee brace.
 

 Dr. Turgeon obtained MRIs of both knees on November 22, 2004, and found in the right knee “mild tricompartmental osteoarthritis, posterior horn medial meniscus tear, prepatellar and retropatellar bursitis and edema of the posterior cruciate ligament.”
 

 Because he had not found any reason for Malant’s symptoms and sense of instability (except the possibility that it came from the low back, |8relative to which he deferred to a doctor specializing in back surgeries), on October 13, 2005, Dr. Turgeon performed a diagnostic arthroscopy and a physical examination while Malant was sedated.
 

 Dr. Turgeon’s notes from surgery stated:
 

 He had full range of motion, no effusion, no crepitance, negative McMurray, no collateral laxity of valgus or varus stress testing from 0 to 30 degrees, and negative pivot-shift, negative anterior drawer, and negative Lachman test with no posterior tibia sag.
 

 [T]he medial compartment showed fraying consistent with a grade 2 chondro-malacia of the medial tibial plateau. There was some softening of the intact articular cartilage in the medial femoral area. I could see where the partial menisectomy had been performed near the junction of the posterior horn in the mid body, but a horizontal cleavage tear had taken over the rest of the posterior horn. This was trimmed back to a stable rim.... The PCL appeared healthy and its integrity was confirmed by blunt probing and arthroscopically.... The lateral compartment showed some tearing of the inner half of the lateral meniscus near the junction of the mid body of the anterior horn. [This] was trimmed back to a stable rim. There was chon-drosis of both articular surfaces. There was some fraying of the cartilage.
 

 Dr. Turgeon’s office notes from Malant’s ■visit of October 18, 2005, stated the incisions had healed and the sutures were
 
 *1064
 
 removed. Malant reported difficulty in getting around because his wife ran over his crutches and he felt the knee wanted to give way. In addition to generalized ehon-drosis of weight bearing surfaces, Malant had retorn the posterior horn of the lateral medial meniscus and there was some tearing of the lateral meniscus. Because there was no evidence of ligament instability to explain the sensation of the knee giving way, the doctor attributed this effect as coming from his back or knee discomfort. The doctor also noted it was important to wean Malant off pain medicine. He was to restart physical |9therapy twice weekly for six weeks and “progress his activities as tolerated.”
 

 Dr. Turgeon referred Malant to Dr. Banta, a Dallas orthopedic surgeon specializing in back surgery; Dr. Vengrow, a neurologist; Drs. Bulger and Rodrigue, anesthesiologists and pain management specialists; and Dr. Marlin, a neurosurgeon.
 

 Dr. Banta remarked that Malant reported his limp which the doctor observed in the office. The doctor’s conclusion that the limp caused Malant to have other medical problems is belied by the PCF’s surveillance video taken in October and November 2007 showing Malant had no gait or limp as he walked up and down the steps at the stadium during a Parkway High School football game. The parties stipulated that had the investigator testified, he would have set out the time frame of his observations and he did not observe Malant having a limp in his right leg or exhibiting back problems or pain.
 

 DISCUSSION
 

 Standard of Review
 

 In
 
 Davis v. Wal-Mart Stores, Inc.,
 
 2000-0445 (La.11/28/00), 774 So.2d 84, the supreme court reviewed the requirements for granting a JNOV. The granting of the JNOV by the trial court following the jury’s rejection of the Malants’ demands is not at issue in this appeal. The
 
 Davis
 
 opinion explained that the appellate court reviews a JNOV using the manifest error standard of review.
 

 1 mUnder the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. In
 
 Jackson v. Tulane Medical Center Hosp. and Clinic,
 
 2005-1594 (La.10/17/06), 942 So.2d 509, 513, the supreme court stated that to reverse a factfinder’s determination, an appellate court must review the record in its entirety:
 

 and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. However, where documents or objective evidence so contradict the witness’s testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the testimony, the court of appeal may find manifest error or clear wrongness even where the finding is purportedly based on a credibility determination. But where this situation does not exist, and a factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
 

 
 *1065
 
 The supreme court discussed the manifest error standard of review in
 
 Hebert v. Rapides Parish Police Jury,
 
 2006-2001 (La.4/11/07), 974 So.2d 635. When the findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of fact, for only the factfinder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where such factors are not present, however, and a factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that Infinding can virtually never be manifestly erroneous or clearly wrong. The rule that questions of credibility are for the trier of fact applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. These standards for manifest error review are not new and are the guiding principles that aid our review of a trial court’s factual determinations.
 
 Hebert, supra,
 
 at pp. 653-654.
 

 The plaintiffs argue that Malant had absolutely no problems with his right knee before Dr. Mays performed surgery on the wrong knee. The plaintiffs maintained that the right posterior horn medial meniscus tear came into existence during or was aggravated by Dr. Mays’ erroneous right knee surgery and was the same tear that existed before Dr. Liu’s surgery. In the Malants’ view, Dr. Mays aggravated the original “complex tear” causing pain and removed part of the medial meniscus, which led to abrasive and erosive changes and more pain. Plaintiffs assert that Ma-lant’s mobility after surgeries by Dr. Mays and Dr. Liu was extremely limited and was very painful. He limped and had to wear a brace. Malant also claimed that he developed back problems due to the limp resulting from his right knee injury.
 

 Plaintiffs allege that Malant had four surgeries due to Dr. Mays’ operating on the wrong knee plus a discogram of his back. Citing the testimony of Dr. Banta, they contend that Malant will need two back and neck surgeries and will have pain in his right knee for the rest of his life. Additionally, Dr. Turgeon testified that Malant may need a total knee replacement at some point.
 

 112The Malants state that as a result of the erroneous surgery, Malant has been declared totally disabled by Social Security and began receiving SSI payments in September/October 2007. Additional consequences attributed to the erroneous surgery were Malant’s unemployment (with a small amount of part-time work he can no longer perform) and the couple’s bankruptcy-
 

 Duration of Damages and Quantum for Pain and Suffering
 

 Instead of the $40,000 pain and suffering award in the JNOY, the plaintiffs sought an increase to $175,000 plus an additional $250,000 arising from future neck and back surgeries. Basically, the Malants contend that the trial court arbitrarily cut off all damages following Dr. Liu’s surgery before Malant went to Dr. Turgeon in Dallas on September 21, 2004.
 

 The PCF urged that there was nothing arbitrary about the trial court’s stopping the Malants’ damages following Dr. Liu’s treatment and physical therapy. The jury and the trial court clearly believed that the Malants were not credible and accepted the medical testimony that the damage was minimal and of short duration while rejecting the testimony of the Dallas doctors who attributed myriad health problems to the erroneous surgery on Malant’s right knee.
 

 Carl Jackson, the physical therapist to whom Dr. Mays referred Malant following
 
 *1066
 
 Mays’ procedures on both knees, testified about the course of physical therapy. The initial evaluation was performed on May 28, 2004. Throughout June, Malant reported that his left knee pain was lesser or minimal while his right knee was stiff with severe pain which Malant consistently rated 10 on a 1 to 10 scale. Malant also displayed a |lsmarked limp. On July 7, Malant reported severe pain in the right knee from which he got some relief immediately after treatment. However, the intense pain soon returned.
 

 In July 2004, Dr. Liu also referred Ma-lant to Jackson for physical therapy. Ma-lant also told the physical therapist that Dr. Liu’s surgery on June 30 made the pain in his right knee worse. Shortly thereafter in July, the decision was made to discontinue the therapy because Malant was not making any progress due to his reported pain. On cross-examination, Jackson stated they used the same treatment on both knees. There was not a lot of pain in the left knee, which they were able to mobilize, while Malant did not tolerate the treatment attempts on the right knee.
 

 Malant came in for a reevaluation on January 30, 2006, and reported 9 out of 10 pain in his right knee along with 9 out of 10 pain levels in his neck and low back. The physical therapist determined that Malant was not an appropriate candidate for physical therapy given the extent of physical impairment and the lapse of time from the last treatment. He was discharged until his pain decreased.
 

 According to the plaintiffs, the trial court rejected the evidence of objective findings and testimony concerning Ma-lant’s condition as diagnosed and treated by Dr. Turgeon and the other Dallas specialists to whom he referred Malant. Plaintiffs asserted that much of their testimony and evidence was uncontradicted.
 

 |14In response to the plaintiffs’ contentions that Malant had no back and right leg problems prior to the mistaken surgery on his right knee, the PCF introduced the following evidence:
 

 [[Image here]]
 

 Concerning Malant’s contention that he suffered debilitating pain from the procedures on his right knee, Dr. Mays testified he made only a skin incision on the back of the knee, but realizing his error, he did not cut nerve or muscle. According to Dr. Mays, the procedures on the right knee were very minor and should have caused no problems, noting that only one patient out of 10 even needs to have physical therapy.
 

 All of plaintiffs’ objections to the quantum awarded by the trial court in the JNOV and by the trial court’s denial of certain elements of damages were based upon the trial court’s finding that the Ma-
 
 *1067
 
 lants’ damages were “minimal and not of long duration.” In its September 3, 2008, judgment, the trial court agreed with the jury’s apparent finding “that the plaintiff had no credibility as to the extent of his injury.” The trial court also observed that the PCF was entitled to a credit of $150,000 with the result that the | ^plaintiffs took nothing, since the total awarded
 
 [6]
 
 did not exceed the $150,000 PCF credit.
 

 The jury and the trial court heard all the testimony and reviewed all the evidence, which contained a remarkable number of inconsistencies, contradictions, exaggerations, and untruths related to almost every aspect of the Malants’ version and interpretation of the alleged damages arising from the erroneous surgery performed by Dr. Mays. The jury rejected the Malants’ claims totally while the trial court reasonably granted the JNOV based upon the admittedly mistaken surgery on Malant’s right knee. Equally reasonable was the trial court’s agreement with the jury’s conclusion that Malant had no credibility concerning the extent of his injury.
 

 Lost Wages
 

 Instead of the $10,000 lost wages granted in the JNOV, the Malants sought for this court to increase that amount to the range of $80,500 to $97,000. Based upon his review of federal tax returns for 2004, 2005, and 2006 and W2s for 2005, 2006, and 2003, along with payroll records from Advanced Air Conditioning and Heating from January through early March 2004, the plaintiffs’ economic expert, Dr. Harju, testified that Malant earned $3,481.64 in 2004. Malant’s documentation revealed that Malant earned $6,604.00 from August to December 2003. The third element Dr. Harju used in his calculations was Malant’s hourly rate of $13.00. Using those three figures, Dr. Harju calculated that Malant had lost wages at a minimum |1fiof $19,635 annually. Dr. Harju also testified he had a payroll summary from Advanced Air Heating and Air Conditioning from January through December 2003 and 2005 through 2007.
 

 The testimony revealed Malant had a varied and inconsistent work history filled with on-the-job injuries, worker’s compensation claims, and long periods of recovery. Malant worked as a hair stylist in Texas for approximately 15 years. In 1997, he worked for Davis International as an electrician’s helper, sustained an on-the-job back injury for which he obtained worker’s compensation and was off work. Approximately six months later, Malant obtained employment at an Iowa K-Mart, where he injured his left knee and received a worker’s compensation settlement. In 1998, Malant came to Shreveport and went to work in the HVAC (heating, ventilation, air conditioning) business. Less than two months later while employed with Lake-shore Air Conditioning, Malant was in a car accident and seriously injured his left wrist. He was on worker’s compensation for approximately four years until he settled his worker’s compensation claim in September 2002. In 2003, Malant went back to work and, while on the job, was involved in this car crash in early March 2004.
 

 Using the testimony of a forensic accountant concerning Malant’s earning in 2005 and 2006, the PCF introduced evidence contradicting Malant’s testimony that he did not work in 2005, 2006, 2007, and 2008. In 2005, Malant was paid $9,300 from Burnside Builders according to that company’s records placed into evidence. Documentation of 2006 checks for Malant’s
 
 *1068
 
 HVAC work from Burnside Builders to Malant contained the |17notation that the copies of checks filed into evidence were everything paid directly to Malant from 8/05 to 6/06 while “Everything else was paid through Air One as his employer. 2 checks for 1300.00 each paid to Air One 6/19/06 and 7/20/06.”
 

 Relying on the testimony of its forensic accountant and Francis Mercer, an employee of Coburn’s Supply Co., Inc., the PCF introduced Coburn records that Ma-lant purchased HVAC equipment totaling $55,865.20 from December 22, 2004, through September 5, 2007, for Alpha Contracting Company.
 

 The Chief Mechanical Inspector for Bossier City, Thomas J. Tanner, verified that people working in that city had proper license and permits. Tanner observed Malant installing air conditioning equipment in new homes on more than one occasion from 2005 until the present. Tanner observed Malant physically working, not just supervising, in 2006. Tanner testified he did not observe Malant limping. On more than one occasion, Tanner called Malant into his office to instruct him to stop working in Bossier City because he was not properly licensed and insured. On cross-examination, Tanner stated that when he showed up at jobs, people stopped working and he did not recall seeing Ma-lant lifting equipment or handling tools, but also said he would not have called Malant into his office if he had not been working.
 

 According to the PCF, Malant’s income was not reported to the IRS or Social Security Administration when he sought permanent disability benefits. Further, Malant did not disclose the income when he filed for | TSpauper status in this litigation and when he filed for bankruptcy in 2007. Based on all the documentation contradicting Malant’s claim, the PCF urged that he is entitled to no recovery for lost wages.
 

 Based upon his finding that Malant had a minimum loss of $19,635 annually and based upon the conclusion that Malant had 11.1 years of remaining work life, Dr. Har-ju calculated that Malant’s lost future wages were in a range of $253,222 to $424,039. The trial court rejected plaintiffs’ request for an award for future lost wages in the range suggested by Dr. Har-ju. Based on the foregoing examples of contradictions and inconsistencies in Ma-lant’s testimony and other evidence, the jury and the trial court must have found him lacking credibility and found that his damage from the admittedly mistaken surgery on his right knee had resolved by the time he left the care of Dr. Liu in September 2004. We find no manifest error in the trial court’s decision to limit the award for past lost wages to $10,000 (apparently covering the approximately six months from March until September 2004, the period in which Malant suffered some ill effects from the procedures on the unintended right knee) and to deny recovery for any future lost wages.
 

 Medical Expenses
 

 Instead of the $11,033.94 award of past medical expenses, the Malants contend on appeal they are entitled to past medicals of $74,499.81, future medical expenses of $107,999.00, and future anesthesia/physical therapy expenses of $184,000.00. Plaintiffs apparently derived these |13figures from the various and extensive procedures which Malant’s team of Dallas specialists opined would be required to repair his damage.
 

 The Malants rely upon what they characterize as uncontradicted testimony of Dr. Banta concerning the medical need for and costs of future surgeries. This court’s review of the entire record has revealed that a reasonable basis exists for the factual
 
 *1069
 
 finding upon which the JNOV was based;
 
 i.e.,
 
 Malant lacked credibility as the extent of his injuries and his damage from Dr. Mays’ error was minimal and not of long duration. The trial court did not commit manifest error in awarding past medical expenses through Dr. Liu’s treatment and denying recovery for future medical expenses.
 

 Loss of Consortium
 

 Concerning the denial of Mrs. Ma-lant’s claim for lost consortium, the plaintiffs requested this court grant an award of $50,000. At one point in cross-examination, Mrs. Malant stated she was not asking the jury for money for herself and was only interested in her husband’s getting the medical attention he needed. Additionally, she testified that the only task she did now which she did not do prior to the surgery was cutting the grass. However, Malant stated that after the surgery he could still push the self-propelled mower “for about a little.” In later testimony, she stated she did not understand loss of consortium and wanted to receive funds to which she was entitled.
 

 In response to the Malants’ claims that the damages from the erroneous surgery had impaired their ability to conceive a child, the PCF12nargued that both Malants “were caught in lies regarding their ability to maintain a sexual relationship.” Mr. Malant had a vasectomy on Valentine’s Day, February 14, 2008, while he was engaged to Trudy who denied knowing that he had gotten a vasectomy that day. She first stated they had broken up at that time. She also testified they were dating, but not a couple, and then she acknowledged they became engaged the December prior to the February 14, 2003, vasectomy. Her explanation was that she got the dates confused. She also said she knew about the vasectomy prior to their August 2003 marriage and because they wanted children, Malant had the vasectomy reversed after they married.
 

 In the JNOV, the trial court did not grant Mrs. Malant an award for loss of consortium. In
 
 Crownover v. City of Shreveport,
 
 43,521 (La.App.2d Cir.9/17/08), 996 So.2d 315, 320, this court stated:
 

 In general, a claim for loss of consortium has seven elements: (1) loss of love and affection, (2) loss of society and companionship, (3) impairment of sexual relations, (4) loss of performance of material services, (5) loss of financial support, (6) loss of aid and assistance, and (7) loss of fidelity; to be compensable, it is not necessary for a claim for consortium to include damages from each type of loss. Not every physical injury will result in a loss of consortium or other general damages. A loss of consortium award is a fact-specific determination, to be decided case-by-case, and is disturbed only if there is a clear showing of an abuse of discretion. Entitlement to loss of consortium damages is a question of fact which will not be reversed in the absence of manifest error.
 
 (Citations omitted.)
 

 Based upon the facts elicited in this case, we discern no abuse of the trial court’s discretion in the factual finding that Mrs. Malant suffered no loss of consortium as a result of the surgery mistakenly performed on her |21husband’s right knee. In the absence of a clear showing of manifest error, we decline to reverse that ruling.
 

 Denial of Dr. Marlin’s Bill
 

 Although the jury entirely rejected plaintiffs’ claims of damages, the trial court accepted the testimony of Drs. Mays and Liu that Malant’s right knee damages were healed by the time Malant was discharged by Dr. Liu on September 1, 2004. Evaluation of expert testimony, including the resolution of conflicts in expert testi
 
 *1070
 
 mony and the factfinder’s decision to credit the testimony of one of two or more witnesses can virtually never be manifestly erroneous or clearly wrong.
 
 Hebert, supra.
 
 Having determined that Malant’s damages were minimal and resolved before Malant sought additional medical treatment in Dallas, the trial court properly denied admission of the neurosurgeon’s bill, since it was unrelated to any harm caused by the mistaken right knee surgery. A review of the record establishes a reasonable factual basis for this evidentia-ry ruling which was neither manifestly erroneous nor clearly wrong.
 

 Assessment of Court Costs
 

 Following the jury trial and based upon evidence adduced at trial, the PCF filed a Motion to Traverse the Malants’ pauper status. At the hearing, evidence was introduced showing the checks Malant received from Burnside Building and Remodeling and his purchase of air conditioning equipment at Coburn’s Supply Company. The funds the Malants received in settlement of their claims against Dr. Mays ($50,000) and WK ($56,000) were also noted. Their bankruptcy filing showed that the Malants valued |22their home at $190,000 (subject to a mortgage of $130,440) and listed their in-ground swimming pool on which they owed $50,578 and a truck on which they owed $31,098. Other debts listed in the bankruptcy were also presented for the trial court’s consideration. On September 3, 2008, the trial court granted the PCF’s Motion to Traverse and revoked and reversed the plaintiffs’ pauper status.
 

 In December of 2008, plaintiffs sought supervisory review in 44,349-CW, complaining about several issues related to their proceeding
 
 in form,a pauperis.
 
 On February 5, 2009, this court denied the writ in part, granted the writ in part and remanded with instructions. Because the trial court’s apportionment of court costs was reviewable on appeal, this court denied relief. Based upon the showing made by the Malants, this court held the exercise of this court’s supervisory jurisdiction was not warranted and denied relief on the Malants’ requests (1) to proceed on appeal as paupers and (2) to roll the costs of the appeal into their Chapter 13 bankruptcy action.
 

 The district court clerk required that all unpaid court costs had to be paid prior to the preparation of the appellate record. In reviewing the writ application, this court reversed the trial court’s refusal to alter the district clerk of court’s calculation of costs. In
 
 Burks v. McKean,
 
 544 So.2d 502 (La.App. 2d Cir.1989), this court held that the only costs the clerk could collect before the clerk prepared the appellate record are those set out in La. C.C.P. art. 2126, or the estimated costs of preparation of the record on appeal, the fee of the court reporter for preparing the transcript, and thejjgfiling fee of the appellate court. On remand, this court ordered the district clerk to issue a new notice of estimated appellate costs limited to those items set out in this court’s writ order.
 

 On appeal, the plaintiffs argued that because they prevailed at trial, the trial court committed manifest error and acted contrary to the interests of justice in failing to cast the PCF with all court costs and costs of prosecuting the claim including the expert witnesses’ fees. In the PCF’s view, the trial court properly split the costs between the parties. The plaintiffs received no money from the JNOV, as the damages awarded were less than the credit to which the PCF was entitled.
 

 Since the Malants’ pauper status was revoked, plaintiffs were not entitled to the provisions of La. C.C.P. art. 5186, requiring the party against whom judgment
 
 *1071
 
 is rendered in favor of a pauper to pay all costs.
 

 La. C.C. P. art. 1920 states:
 

 Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
 

 Except as otherwise provided by law,
 
 the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
 
 (Emphasis added.)
 

 La. R.S. 18:4533 sets out expenses that are allowed to be taxed as costs, which include “the costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court.” The trial judge has great discretion in awarding costs, and his assessment of costs can be reversed by the appellate court only upon a showing of an abuse of discretion.
 
 In re Succession of Pitman,
 
 42,654 (La.App.2d Cir.10/24/07), 968 So.2d 871.
 

 laJn this case, the trial court heard all the testimony about the Malants’ income, reported and unreported; financial situation; and property. In assessing costs, the trial court stated in open court and the September 4, 2008, judgment specifically provides that “the clerk of court costs are to be divided evenly between the parties.” Thus, the Malants and the PCF are each paying half of only the costs attributable to the clerks of the district and appellate courts. The trial court’s ruling leaves the parties responsible for paying their own experts, deposition costs and other expenses incurred in preparation for trial.
 

 The trial court’s revocation of the Ma-lants’ pauper status was reasonable in view of the evidence presented about the plaintiffs’ financial situation. We find no manifest error or clear wrong in the trial court's carefully considered division between the parties of the direct costs of the clerks of court while leaving each side responsible for all other expenses they incurred in pursuing and defending this litigation.
 

 CONCLUSION
 

 This record clearly contains a reasonable factual basis for each factual finding from which plaintiffs seek relief on appeal. Our review of the record reveals no clear wrong or manifest error. The jury and the trial judge heard the testimony and were in the best position to evaluate variations in demeanor and tone of voice that influence heavily the listener’s understanding and belief in what is said. The factfin-der’s decision to credit the testimony of one of two or more witnesses and reject others can virtually never be manifestly erroneous or clearly wrong. The rule that questions of Incredibility are for the trier of fact also applies to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony.
 

 The factfinders accepted the testimony of Drs. Mays and Liu regarding the alleged harm from the unintended erroneous surgery on Malant’s right knee and the short duration of the ill effects. Clearly, the jury and the trial court heard and rejected both Malants’ version of events and that of the doctors who treated Malant after he left Dr. Liu’s care.
 

 DECREE
 

 The judgment is affirmed in all respects, with all costs attributable to the clerk of the Second Circuit Court of Appeal to be divided equally between the plaintiffs and the Louisiana Patient’s Compensation Fund.
 

 AFFIRMED.
 

 [1]
 

 . The JNOV states that the credit to which the PCF is entitled totals $150,000 while at other places in the record, the amount of the credit is stated to be $156,000. Since the total amount awarded in the JNOV totals $61,033.94, this discrepancy is not relevant to the resolution of this appeal.
 

 [2]
 

 . The trial court obviously misspoke when referring to the "defendant,” since its refer
 
 *1061
 
 ence clearly pertained to the claimant, Ted Malant. This was corrected in the JNOV.
 

 [3]
 

 . The trial court clarified that the court costs to be split were those attributable to the Clerk of Court.
 

 [4]
 

 . Fibrous cartilage within a joint; either of two crescent-shaped lamellae of fibrocartilage that border and partly cover the articulating surfaces of the tibia and femur at the knee.
 

 [5]
 

 . Myxoid means containing mucus.
 

 [6]
 

 . Plaintiffs’ total award in the JNOV was $61,033.94, consisting of $40,000 for pain and suffering, $10,000 for lost wages, and $11,033.94 for medical expenses.