DREW, J.
lain this medical malpractice case in which the defendant hospital admitted liability, Matha Curry appeals the award of general and special damages and the assessment of costs. We reverse that part of the judgment ordering Curry to pay any part of the costs of doctors’ depositions and medical records. In all other respects, the judgment is affirmed.
FACTS
Matha Curry, a resident of Arkansas who was born in 1925, was injured while a patient at Healthsouth Rehabilitation Hospital in Homer, Louisiana. Curry, who was suffering from the effects of a stroke that occurred several years earlier, was at Healthsouth to receive physical rehabilitation. On August 29, 2002, a nurse tech, Sue Weathers, was assisting Curry to stand at her bedside. While Curry had her right hand on the bed rail, the bed began rolling backward and Curry lost her balance. Although Weathers was able to ease Curry to the floor, Curry’s right arm had become entangled in the bed rail, causing two fractures of the upper right arm, one near the shoulder and the other near the elbow. The long-term effects of the fracture of the right proximal humerus and of the supracondylar area of the right humerus were disputed by the parties. Curry contended that the fractures rendered her right arm and hand useless. Healthsouth countered that paralysis caused by an earlier stroke had essentially rendered the right arm and hand nonfunctional prior to the August 29 accident.
The matter was submitted to a medical review panel, before which Healthsouth admitted liability. The panel concluded that Curry’s stroke was | sthe primary cause of the loss of use of her right arm and hand. The panel added that the disability caused by the fractures was minimal at best, that the disability lasted approximately two months, and the fractures did not cause or contribute to any further permanent impairment of her ability to function.
Curry subsequently filed suit against Healthsouth, Sue Weathers, and Columbia Casualty Insurance Company.[1] She alleged that despite suffering from a stroke and having minimal paralysis, she was able to use her right arm on a limited basis until the accident, and that afterward she lost total use of her right arm. In its answer, Healthsouth admitted that Curry’s fall was the result of its negligence.
Pursuant to Healthsouth’s stipulation and Curry’s motion for summary judgment, the trial court entered judgment against Healthsouth on the issue of liability. The trial court subsequently conducted a brief bench trial on the issue of damages where it heard testimony from Curry’s son. Curry’s medical records dat *1146 ing back to 1992 and medical billing records were accepted into evidence. The trial court also was provided with the depositions of Curry, Weathers, Dr. Greg Vigna,[2] and Dr. Stephen Wheat.[3]
The trial court awarded $30,000.00 in general damages for pain and suffering, and $3,198.90 in special damages for medical expenses. The trial court recognized a Medicare lien of $2,064.25 and a Medicaid lien of $452.99. Court costs were assessed against Healthsouth. The costs of Dr. Wheat’s deposition, to which Curry’s attorney had arrived three hours late, were assessed against Curry. The costs of the medical records and Dr. Vigna’s deposition were ordered to be shared equally between Curry and Healthsouth.
14Curry has appealed, arguing that the trial court abused its discretion in awarding a low amount of general damages, that the trial court was manifestly erroneous in awarding only $3,198.90 in medical expenses, and the trial court erred in its assessment of the costs of medical records and depositions.
DISCUSSION

General Damages

The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses, and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174.
Dr. Fred Murphy started treating Curry in April of 1992, initially for complaints related to her right knee. In 1997, Curry began receiving services from the Southwestern Arkansas Development Council (“SADC”), which sent aides to Curry’s apartment to assist her with meal preparation, personal care and grooming, basic upkeep and home management, laundry, and shopping. At the time, Curry was living alone in an apartment for the elderly in a government-owned housing complex.
When Dr. Murphy examined Curry on June 19,1998, she complained that she was having trouble using her right arm and leg, a condition which |fishe said had developed over the prior few weeks. She also stated that she was unable to walk without her walker and that she dragged her right leg. Dr. Murphy suspected a stroke had affected the right side of her body.
Curry began physical therapy the next month with Magnolia Hospital Home Health, which seemed to help with weakness on her right side. However, by the following January, she was complaining to Dr. Murphy of being unable to get around very well. A partial right-sided hemipare-sis was noted. Curry also complained to Dr. Murphy about having shortness of breath.
Curry underwent a quadruple coronary artery bypass in April of 1999. A few months later, toileting was added to the tasks performed by the aides provided by SADC. Curry fell in July of 1999 and fractured her left ankle. She was exam *1147 ined at Magnolia Hospital in Arkansas for decreased level of consciousness. The following November, a CT scan of her head was performed after a change in mental status was noted. Curry had been able to sign her name. However, in November of 1999, instead of signing her name to an SADC aide visit report, Curry marked the report with an “x.”
Dr. Murphy noted after examining Curry in February of 2000 that she had increased spasticity and contractures on her right side, and that she was having difficulty using her right arm and leg.- Dr. Murphy noted three months later that Curry had done better with physical therapy and was able to move around a little more with assistance and her walker. Curry moved into a disabled apartment in her complex in June of 2000.
Curry was taken to Magnolia Hospital in October of 2000 with complaints of chest pain and shortness of breath. She returned to Magnolia Hospital in July of 2001 with the same complaints. In November of 2001, IfiDr. Murphy examined her after she passed out. Curry received heart stents in May of 2002. Later that May, she was taken to Magnolia Hospital after she experienced a decreased level of consciousness. Curry returned to Magnolia Hospital in July of 2002 after she nearly fainted.
Curry’s ability to care for herself had decreased to the point that by July of 2002, she needed an aide’s help seven days a week with bathing, combing her hair, skin care, dressing, toileting, mobility transfers, meal preparation, housekeeping, and basic home upkeep. She also needed help once a week with shampooing her hair, laundry, and shopping. Curry was bed and wheelchair bound, and she stood to pivot with transfers. It was noted by SADC that Curry was then totally dependent on aides for all care. Curry marked with an “x” instead of signing a personal care assessment and service plan form from SADC.
Dr. Murphy wanted Curry to have physical therapy and additional strengthening of the leg. She had been confined to a wheelchair for approximately a year. Curry was admitted to Healthsouth on August 1, 2002. She marked a consent release form at Healthsouth with an “x” instead of signing her name.
It was noted at Healthsouth that she was unable to transfer herself from her wheelchair to a bed or a toilet. Curry was hopeful that rehabilitation would make her strong enough to return home and live independently at the wheelchair level.
An examination done shortly after admission showed that gross and fine coordination of the right arm was impaired. Two sensation tests (stereognosis and pro-prioception) were performed. Stereogno-sis was tested in the right fingers and was found to be impaired. Proprioception was tested 17in the right shoulder, elbow, wrist and fingers, and was found to be impaired in all four areas tested.
Staff at Healthsouth discovered Curry unresponsive to verbal stimuli on August 10, 2002. She was taken to Homer Memorial Hospital for evaluation. She was discharged from there with a diagnosis of a urinary tract infection and bradycardia.
Curry was readmitted to Healthsouth on August 14, 2002. She again marked a general consent release form with an “x” instead of her signature. Dr. Greg Vigna, a physical medicine rehabilitation doctor at Healthsouth, considered Curry’s rehabilitation potential to be fair at that time. However, Dr. Vigna noted on August 19, 2002, that he was unsure if Curry would reach independence at wheelchair level prior to discharge. Dr. Vigna noted four days later that he felt Curry could reach a *1148 minimum assistance level, but doubted she could reach a level where only supervision was required. Dr. Vigna thought her rehabilitation potential was guarded on August 25. She still needed moderate assistance with transfers at that time, but was progressing slowly to needing only minimum assistance.
Curry was able to ambulate 50 feet using a walker and with minimum assistance on August 28, 2002. Dr. Vigna noted that she still needed minimum assistance with upper extremity dressing, and moderate assistance with transfers and lower extremity dressing. Curry broke her arm the following morning.
Curry was initially taken on August 29 to Claiborne Family Medical Center for treatment of her broken arm. A sling and swathe were used to immobilize her right arm so that it would heal properly. She was also examined by orthopedic surgeon Dr. Edward Anglin, who thought the | sproximal humerus fracture was well aligned, and the supracondylar humerus fracture was nondisplaced. Dr. Anglin ordered followup x-rays in two weeks.
After returning to Healthsouth, Curry began complaining of chest pain and shortness of breath late on August 29. She was transferred to Homer Memorial Hospital for evaluation, where she was admitted and found to have chest pain secondary to the right arm fractures. She was discharged to Healthsouth on September 3, 2002.
Dr. Vigna evaluated Curry on September 4. He noted weakness of the right wrist extension, but he thought it was likely caused by the prior stroke. The goal of rehabilitation remained getting Curry to a level where she required only minimum assistance.
Dr. Anglin examined Curry on September 11. He found limited motion of the right shoulder and no active motor function of the right hand. X-ray of the right shoulder showed the proximal humerus fracture was well aligned and impacted. Dr. Anglin recommended continuation of the sling and swathe and followup in two weeks.
Dr. Vigna noted on September 15, that in his opinion, it was unsafe for Curry to live alone even before she broke her arm. Three days later, Dr. Vigna noted that Curry was tolerating therapy well, but she was quite dependent, and her prognosis was poor for functional independence. Curry was beginning to get movement back in the right shoulder on September 21.
Dr. Anglin examined Curry on September 25. Swelling of the right deltoid biceps region was present, and her right shoulder motion was limited. An x-ray showed that the proximal humerus fracture had fairly 19good alignment. Dr. Ang-lin recommended that she have a followup visit in two weeks.
Dr. Vigna found that Curry had a stable hand grip as well as elbow extension on September 29. He found no evidence of radial nerve injury at that time. Curry was beginning range of motion activities by doing pendulum and circumduction movements with her right arm. Dr. Vigna thought that overall Curry had a poor prognosis.
Dr. Vigna noted on October 4 that Curry did not complain of right arm pain while making pendulum movements. She seemed to be tolerating range of movement exercises well. He further noted that he did not think that Curry had been able to live independently even prior to fracturing her right arm.
Dr. Vigna recorded on October 6 that progress had been slow and Curry was agreeable to being placed in a nursing *1149 home. He noted that she still needed moderate assistance with transfers.
Dr. Anglin examined Curry on October 9. Curry reported mild pain, and there was mild swelling of the right shoulder. Curry experienced pain with rotation or any movement of the right shoulder. An x-ray of the right shoulder showed a proximal humerus fracture with overlapping fracture fragment. The overall alignment was acceptable. He recommended that she get a followup x-ray of the right shoulder in two weeks.
On October 18, 2002, Curry was discharged from Healthsouth to Meadow-brook Nursing Home. The discharge instructions stated that Curry needed set-up assistance with eating and grooming; moderate assistance with bathing, toileting, dressing, toilet transfers, and tub/shower transfers; and total assistance with meal prep and housekeeping.
lioOn November 7, 2002, Curry was taken to Magnolia Hospital after she fell while being transferred to her bed and landed on her right knee. She complained of right knee pain and soreness in her right arm. It was noted that Curry had decreased motor strength in her right arm. Curry told the emergency room physician that this was her baseline from her prior stroke. An x-ray of the right humerus showed a healing proximal humerus fracture. Curry returned to Magnolia Hospital on November 20 with complaints of nausea and having almost fainted. She again went to Magnolia Hospital on January 29 with complaints of chest pain and shortness of breath.
A chest x-ray taken at Magnolia Hospital on February 12, 2003, showed an old healed fracture of the proximal right humerus. An x-ray of the right shoulder taken on February 17 showed no acute fracture or subluxation.
Curry returned to Magnolia Hospital on March 3, 2003, complaining of dizziness and reduced levels of consciousness; on April 11, 2003, complaining of reduced levels of consciousness and elevated blood pressure; and on July 14, 2003, complaining of chest pain.
Dr. Vigna testified at his deposition that the goals of Curry’s rehabilitation were to get her independent at a wheelchair level so she could get in and out of the wheelchair by herself, go to the bathroom by herself, and dress herself. Dr. Vigna thought her right arm was essentially nonfunctional because of the stroke. Her right shoulder could not put the hand where it needed to be, and her right hand could not grasp objects. Dr. Vigna thought Curry was in slow decline from her stroke, and her condition was not going to improve. The objective was to keep her from getting worse through therapy. Dr. Vigna felt that even if Curry had never broken her |1Tright arm, she still would have been placed in a nursing home as he did not think she could live independently. Dr. Vigna expected the recovery period for a humerus fracture in someone with normal arm function to be two to four months. In Curry’s case, he thought it would be about two months because of her poorly functioning arm.
The trial court concluded that the fractures were most likely resolved as much as they would be by February 17, 2003. The trial court found that the fractures did not cause Curry to have a permanent, total disability. However, the court found that because the fractures kept Curry from undergoing the rehabilitation planned for her at Healthsouth, the fractures diminished any chance that she had of improving the existing paralysis of her right arm and hand with therapy.
Based upon our review of this record, we cannot conclude that the trial court *1150 abused its discretion in awarding $30,000.00 in general damages to this elderly stroke victim with preexisting paralysis on the right side whose arm fractures resolved in approximately six months and did not cause permanent disability.

Special Damages

Special damages are those which have a “ready market value,” such that the amount of damages theoretically may be determined with relative certainty, including medical expenses. Guillory v. Lee, 2009-0075 (La.6/26/09), 16 So.3d 1104. An appellate court, in reviewing a trial court’s factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusions, and the finding must be clearly wrong. Id.
| scurry argues that the amount awarded was clearly wrong as evidenced by a Medicare lien of over $44,000.00 related to the treatment of the fractures. The Medicare payment summary form showing this lien does not demonstrate how these charges were related to treatment for the fractures. For example, Speciality Hospital of North Louisiana was reimbursed more than $18,000.00 for treatment from September 3 to October 18, 2002. Presumably, this was Healthsouth, where Curry was undergoing rehabilitation to deal with the effects of the stroke on her right arm and leg. As another example, Magnolia Health Care Center was reimbursed more than $20,000.00 for treatment provided from October 18, 2002 to January 25, 2003. Presumably, this was Meadowbrook nursing home where Curry went to live after being discharged from Healthsouth.
The diagnosis codes provided on the Medicare form are not sufficient to specifically establish the relationship between the fractures and the medical expenses that were reimbursed. Accordingly, the trial court was not clearly wrong in awarding $3,198.90 in special damages.

Assessment of Costs

La. C.C.P. art.1920 provides that “[except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.” La. R.S. 13:4533 sets out expenses that are allowed to be taxed as costs, which include “the costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court.” See also La. R.S. 13:3666 regarding the compensation of expert witnesses and the costs of medical reports and copies of hospital records.
113The trial judge has great discretion in awarding costs, and his assessment of costs can be reversed by the appellate court only upon a showing of an abuse of discretion. Succession of Pitman, 42,654 (La.App.2d Cir.10/24/07), 968 So.2d 871; Malant v. Willis-Knighton Pierremont Health Center, 44,988 (La.App.2d Cir.3/8/10), 32 So.3d 1058, twit denied, 2010-0761 (La.6/4/10), 38 So.3d 304.
Curry proceeded in forma pauperis in this matter. Regarding the waiver of costs for an indigent party, La. C.C.P. art. 5186 states:
An account shall be kept of all costs incurred by a party who has been permitted to litigate without the payment of costs, by the public officers to whom these costs would be payable. If judgment is rendered in favor of the indigent party, the party against whom the judgment is rendered shall be condemned to pay all costs due such officers, who have a privilege on the judgment superior to the rights of the indigent party or his attorney. If judgment is rendered against the indigent plaintiff and he is condemned to pay court costs, an affida *1151 vit of the account by an officer to whom costs are due, recorded in the mortgage records, shall have the effect of a judgment for the payment due.
The discretion provided in La. C.C.P. art.1920 is limited in a pauper case by the more specific provision found in La. C.C.P. art. 5186, which mandates the assessment of costs to the party against whom judgment is rendered. Ulyanov v. Ulyanov, 2009-0642 (La.App. 4th Cir.9/23/09), 23 So.3d 380.
Healthsouth argues that the sharing of the costs of the medical records and Dr. Vigna’s deposition was not an abuse of discretion because the trial court acted fairly in light of what had occurred with a prior attempt to settle the case. The claim was mediated in December of 2006, and the parties agreed to settle the case for $37,250.00. Healthsouth tendered a check in that amount to Curry with the condition that Curry execute a receipt and | urelease agreement. Curry negotiated the check in June of 2007 without executing the agreement. Healthsouth filed a motion for return of funds in March of 2009 to recover the money.
While we are sympathetic to the frustrations experienced by Healthsouth in its good-faith attempt to settle the matter, the provisions of La. C.C.P. art. 5186 are mandatory. The assessment of the costs of the doctors’ depositions and medical records against Curry was an abuse of discretion. Those costs are to be assessed against Healthsouth.
Healthsouth also argues that the issue of who pays Dr. Wheat’s deposition avoids the clutches of art. 5186 because it is more along the lines of a sanction than the assessment of a cost. We find this argument unpersuasive. The trial court never referred to it as a sanction. The trial court did mention that it was the subject of a prior ruling; however, that ruling is not in the record before this court.
CONCLUSION
We affirm the award of $30,000 in general damages and $3,198.90 in medical expenses. We reverse the assessment of any cost of the doctor depositions and medical records against Curry. Appeal costs are assessed against Healthsouth.
AFFIRMED IN PART; REVERSED IN PART.

. Weathers filed the exception of prematurity asserting that Curry had not submitted the claim against her to a medical review panel. The exception was maintained, and the petition against Weathers was dismissed.

. Dr. Vigna had treated Curry at Healthsouth.

. Dr. Wheat had been a member of the Medical Review Panel.